1              IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF ARKANSAS
2                   WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,    .
                      . Docket No. 4:18-CR-00016-02 KGB
5  PLAINTIFF,             .
                      . Little Rock, Arkansas
6  VS.                  . March 6, 2018
                      . 11:08 A.M.
7  KENWAN SHERROD,         .
                      .
8  DEFENDANT.            .
   . . . . . . . . . . . . . .
9

10

11                    TRANSCRIPT OF

12                  DETENTION HEARING

13          BEFORE THE HONORABLE JOE J. VOLPE

14           UNITED STATES MAGISTRATE JUDGE

15

16

17

18  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Lorna Jones

19

20  Transcription Service:          Robin Warbritton
                          Post Office Box 262
21                       Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

1  APPEARANCES:

2  For the Government:        Ms. Stephanie Gosnell Mazzanti
                              U.S. Attorney's Office
3                             Eastern District of Arkansas
                              Post Office Box 1229
4                             Little Rock, AR  72203-1229

5  For the Defendant:         Ms. Latrece E. Gray
                              Federal Public Defenders Office
6                             The Victory Building
                              1401 West Capitol Avenue
7                             Suite 490
                              Little Rock, AR  72201

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        I N D E X

2                                                    PRESIDING
                    DIRECT   CROSS   REDIRECT   RECROSS   OFFICIAL
3

4   DEFENDANT'S WITNESSES:

5   Essence Williams        5      11       21        30        31

6   Steven Green           36

7

8   GOVERNMENT'S WITNESS:

9   Chris Schmeckenbecher   38     60       72        72        73

10

11  EXHIBITS:                      IDENTIFIED      RECEIVED

12  Government's Exhibit A             20              21

13  Government's Exhibit B             21              21

14

15

16

17

18

19

20

21

22

23

24

25

1       P R O C E E D I N G S

2       (Call to order of the Court.)

3           THE COURT:  Good morning.

4           MS. GRAY:  Good morning.

5           MS. MAZZANTI:  Good morning, Your Honor.

6           THE COURT:  We are here in the matter of the *United*

7  *States of America v. Kenwan Sherrod*, case 4:18-00016, and Mr.

8  Sherrod is defendant number 2.  And we're here for a detention

9  hearing.  And I believe it's a presumption case?

10          MS. MAZZANTI:  It is, Your Honor.

11          THE COURT:  All right.  Then, Mr. Sherrod, this is a

12  presumption case, and I'm going to explain to you real quick

13  what that means.  Most often, in a criminal proceeding, it's

14  up to the prosecution to go first, but under the Bail Reform

15  Act, and which the basis we're here today is to determine

16  whether you can be released on bond, when there are certain

17  charges that are levied on an individual, those charges

18  presume that you're a risk of flight and/or a danger to the

19  community, and it requires you to go first with the

20  presentation of some evidence to show that you're not a risk

21  of flight or a danger to the community.  And so, it will be

22  your obligation to go first, which is a unique situation in a

23  criminal setting, but I know Ms. Gray is well versed on that.

24          And I'll let you proceed, Ms. Gray.

25          MS. GRAY:  Thank you, Your Honor.  Defense calls

                      Williams - Direct                    5

1    Essence Williams.

2            THE COURT:  Ma'am, if you'll stop right there for a

3    second and face this young lady, she's going to put you under

4    oath.

5            MS. WILLIAMS:  Okay.

6        ESSENCE WILLIAMS, DEFENDANT'S WITNESS, SWORN.

7            THE COURT:  All right.  And then you can come over

8    here and sit right here, ma'am.

9            MS. WILLIAMS:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11                      DIRECT EXAMINATION

12   BY MS. GRAY:

13   Q   Good morning.  Ms. Williams, would you state your name for

14   the record?

15   A   Essence Williams Sherrod.

16   Q   And how do you know Kenwan?

17   A   He's my son.

18   Q   How old is Kenwan?

19   A   He's 21.

20   Q   How many children do you have?

21   A   I have two living and one deceased.

22   Q   So, is Kenwan -- who is your other child that's living?

23   A   Dallas Hicks.

24   Q   Okay.  And who is your deceased child?

25   A   Bernard Sherrod.

1   Q   When did Bernard pass?

2   A   2014.

3   Q   Okay.  Does Kenwan have any children?

4   A   Yes, he does.

5   Q   How many children?

6   A   He has two.  And one, I'm raising.

7   Q   So of the two children, you're raising one?

8   A   Uh-huh.  Yes, ma'am.

9   Q   Okay.  So, first place, where do you live?  I don't need

10  your physical address, but what city?

11  A   In Jacksonville, Arkansas.

12  Q   Okay.  And where was Kenwan born?

13  A   He was born in -- he was born in Little Rock, Arkansas.

14  Q   And how long has he been in the Little Rock, Arkansas

15  area?

16  A   For 21 years.

17  Q   Okay.  So, all of his life?

18  A   Yes, ma'am.

19  Q   So the child that -- Kenwan's child that you are raising,

20  that child lives with you?

21  A   Yes, ma'am.

22  Q   How old is that child?

23  A   He's one years old.

24  Q   And then, what's the name of the other child?

25  A   Ashton.

Williams - Direct                                    7

1    Q   Ashton's last name?

2    A   Uh-huh.  He's not -- he's not a Sherrod.  It's Ashton

3    Murray.

4    Q   Okay.  And where is Ashton located?

5    A   He's with his mom.

6    Q   Where?

7    A   In Southwest Little Rock.

8    Q   So, the second baby is in -- in Little Rock?

9    A   Uh-huh.  Yes, ma'am.

10   Q   Okay.  Any other family members of Kenwan's here in the

11   Central Arkansas area?

12   A   Yes.

13   Q   Who?  You don't have to give me their names, but who are

14   they -- what are their relations to?

15   A   His grandmother, which is my mom.

16   Q   Okay.

17   A   And his uncle, which is my brother.  And his sister -- of

18   course, his sisters -- his sister.  I'm sorry.

19   Q   Okay.

20   A   And my sister, which is his aunt.

21   Q   Okay.  So his grandmother, his aunt, his uncle, and his

22   sister, and his two children, are all here in the Central

23   Arkansas area?

24   A   Yes, ma'am.

25   Q   Okay.  Let's talk about before -- first place, are you

Williams - Direct                                    8

1   aware of what Kenwan is charged with doing in federal court?

2   A   Yes, ma'am, I am.

3   Q   Okay.  Are you aware that he has a state court charge?

4   A   Yes, ma'am, I am.

5   Q   What -- do you know what the state court charge is?

6   A   Bribing a witness.

7   Q   Okay.  Was he arrested on that state court charge?

8   A   Yes.

9   Q   Okay.  And was there a bond posted?

10  A   Yes.

11  Q   How much was the bond?

12  A   A hundred thousand.

13  Q   Okay.  And was that bond posted?

14  A   Yes, it was.

15  Q   Okay.  So, I'm not certain if you know the order of

16  events.  Do you know which occurred first, the bribery charge

17  or the conduct for which he's accused of --

18  A   The conduct --

19  Q   Okay.

20  A   -- for which he's accused of.

21  Q   Accused of?

22  A   Yes, ma'am.

23  Q   Okay.  That happened first, and then the bribery charge

24  came up?

25  A   Uh-huh.  Uh-huh.

1    Q    Okay.  The bribery charge, is it your understanding that

2    is alleged to have happened September of 2017?

3    A    Yes, ma'am.

4    Q    Okay.  And this conduct for which he's before the Court,

5    is it your understanding that happened June of 2017?

6    A    Yes, ma'am.

7    Q    Okay.  Was Kenwan working before he was arrested?

8    A    Yes.

9    Q    Where did he work?

10   A    He was working for Mr. Smith at a construction, he has his

11   own business building houses, doing things like that.

12   Q    Okay.

13   A    Installing tubs and things like that.

14   Q    How far did Kenwan get in school?

15   A    He graduated.

16   Q    From?

17   A    Premier.

18   Q    What is that?  Premier?

19   A    It's that school -- it's a Charter school that's in

20   Baptist College now.

21   Q    Okay.  So, and the name of the school, is it Premier High

22   School?

23   A    Premier High School.  Yes.

24   Q    Okay.  Does Kenwan have any criminal convictions, to your

25   knowledge?

1  A    He had been in trouble --

2  Q    I'm talking convictions.

3  A    No.  No.  No.  No.

4  Q    Okay.

5  A    Clean record.

6  Q    Okay.  Now you and I have discussed the responsibilities

7  of a third party custodian, correct?

8  A    That's correct.

9  Q    And let's go back with -- with you, if Kenwan were to be

10  released, where would he be released to?

11  A    My home.

12  Q    Okay.  Your home in Jacksonville?

13  A    Yes, ma'am.

14  Q    And who else lives in the home?

15  A    His son, and his child's mother.

16  Q    Okay.  And do you work?

17  A    No, I'm disabled.

18  Q    Okay.  So you're home all day?

19  A    All day, yes.

20  Q    Okay.  Part of the duties of a third party custodian would

21  require that the Court would give Kenwan some conditions of

22  his release, and you would also be given a copy of those

23  conditions.  Are you aware that if he violates those

24  conditions, and you're -- you know about the violation, you

25  are responsible for turning him in?

1   A    I'm very, yes, ma'am.

2   Q    Okay.  And are you willing to actually have to turn in

3   your son if you have to?

4   A    Yes, ma'am.

5   Q    What's your relationship like with your son?

6   A    We're better.

7   Q    Okay.

8   A    He was a little lost, a little bit, after his brother's

9   death, but we're good.

10  Q    Okay.  You said his brother passed in 2014?

11  A    Yes.

12  Q    How close was he, Kenwan, to his brother?

13  A    They were close.  That was his only brother.

14          MS. GRAY:  Nothing further of this witness, Your

15  Honor.

16          THE COURT:  Cross?

17                    CROSS EXAMINATION

18  BY MS. MAZZANTI:

19  Q    Morning, Ms. Williams.

20  A    Good morning.

21  Q    Ms. Williams, you're aware that your son was involved in

22  gang activity as early as 2014; is that right?

23  A    I noticed it, yes, ma'am.

24  Q    Okay.  And originally, who was he involved with in the

25  gang, and what gang was that?

Williams - Cross                                    12

1          MS. GRAY:  Objection to relevance, Your Honor.  It's

2    no crime to belong -- if -- assuming this information is true,

3    but gang membership is not a crime.

4          MS. MAZZANTI:  Gang membership is not a crime, but

5    his affiliations with dangerous people are.

6          THE COURT:  Yeah.  Overruled.  I think it bears to

7    the dangerousness.

8          THE WITNESS:  Go ahead.  I'm sorry.  Can you repeat

9    the question?

10   BY MS. MAZZANTI:

11   Q   Who is it that he was originally affiliated with, what

12   gang?

13   A   Oh, they -- they were through, I guess, Crips.

14   Q   Okay.  And you guess Crips.  Do you know Chris Alexander?

15   A   Yes, ma'am, I do.

16   Q   Was he a member of the Wolfe Street Crips?

17   A   Yes, he is.

18   Q   Okay.  And is that how your son originally became involved

19   with that group?

20   A   Well, to be exact, Mr. Alexander was doing things with the

21   youth, and I -- I trusted him, yes, and he ended up doing what

22   he wanted to do, turning it into something different, you

23   know.

24   Q   Okay.  Mr. Alexander turned his relationship into your --

25   with your son into something of an illegal nature?

1   A    To me, negative.  Negative.

2   Q    Okay.  And that includes drug trafficking; is that right?

3   A    I'm not sure what he was doing with the drug trafficking.

4   Q    All right.  Do you remember speaking with me and Task

5   Force Officer Passman, Task Force Officer Lamaster, and Task

6   Force Officer Schmeckenbecher --

7   A    Yes.

8   Q    -- on January 18th of 2018?

9   A    Yes.

10  Q    All right.  And at that time, was it your understanding --

11  didn't you relay to us that Mr. Alexander had your son start

12  selling marijuana for him?

13  A    No, I never said marijuana.  I said he had him on the

14  wrong path.

15  Q    Okay.

16  A    Which if in that, maybe -- maybe it was marijuana, you

17  know.

18  Q    Okay.  Was your son selling drugs for Mr. Alexander?

19  A    I'm not sure of that.

20  Q    You knew Mr. Alexander for several years?

21  A    Yes.  Yes, I did.  I dated him.

22  Q    Okay.  And Mr. Sherrod's, the defendant, your son's

23  father, is actually also a member of the Wolfe Street Crips;

24  is that right?

25  A    I don't know if it's Wolfe Street, but I know he's a Crip.

1   Q   Okay.  And he's currently -- is he currently incarcerated?

2   A   Yes, ma'am.

3   Q   Okay.  And do you recall relaying an event in May of 2016,

4   when you went to Mr. Alexander's house and saw your son

5   standing on the front porch?

6   A   Yes, I do.

7   Q   And how you tried to get your son to leave and go home

8   with you?

9   A   Yes.

10  Q   And he did not go home with you that day?

11  A   That is correct.

12  Q   And your son wouldn't talk to you, he just stood there?

13  A   Yes.

14  Q   And then, at that time, Mr. Alexander told you to leave

15  and pointed a gun at you?

16  A   Yes.

17  Q   And then you fled in your vehicle and you got in accident;

18  is that right?

19  A   Yes.

20  Q   And so, then, didn't you explain that Mr. Sherrod began

21  hanging around with Machita Mitchell at some point?

22  A   Yes.

23  Q   And what's his nickname?

24  A   Frog.

25  Q   And based upon your previous statement, didn't you tell

1  law enforcement that Mr. Mitchell and Mr. Alexander were

2  partners in a large scale drug trafficking operation with some

3  Mexicans?

4  A   Yes, I did.

5  Q   And those individuals were suppliers of cocaine and

6  marijuana; is that right?

7  A   Yes.

8  Q   And you even knew one of them -- what they called one of

9  them; do you remember his name?

10  A   George.

11  Q   And did you indicate to investigators that when speaking

12  with your son, that your son relayed that Alexander and

13  Mitchell communicated with George through Facebook?

14  A   Uh-huh.

15  Q   Is that yes?

16  A   Yes.

17  Q   I'm sorry.  There is a record and --

18  A   Yes.

19  Q   -- the uh-huhs and uh-uhs don't --

20  A   Yes.

21  Q   -- don't pick up very well.  And you actually even saw Mr.

22  Alexander and Mr. Mitchell's wife at some point, in

23  Jacksonville, meeting with George; is that right?

24  A   Yes.

25  Q   And there were some black trash bags?

1  A    Yes.

2  Q    And tell us what you saw on that day.

3  A    That day, I was on my way home.

4           MS. GRAY:  Your Honor, again, I object.  This -- what

5  does this have to do with Kenwan Sherrod?

6           THE COURT:  Well, you're proposing -- or at least

7  what I heard was he's supposed to go live with Ms. Williams,

8  right?

9           MS. GRAY:  Correct.

10          THE COURT:  So I think that bears materially on his

11 release if -- or you're proposing I release him to a situation

12 where there's criminal activity, so.

13          MS. GRAY:  But she's not referring to --

14     (Banging noise in the courtroom.)

15          MS. GRAY:  Be quiet, Ms. Williams.  She's not

16 referring to any criminal activity going on in her home.

17 She's referring to the criminal activity of other people.

18          THE WITNESS:  Uh-huh.

19          THE COURT:  I realize that.  But I think it's a fair

20 line of questioning that -- you know, what she's trying to

21 establish.  And it appears that Ms. Williams was at least

22 providing information to law enforcement, so I -- I gather

23 that, as well, you know, as a positive for her, but I think

24 it's fair information to come to light in this hearing.

25          MS. MAZZANTI:  And just for the record, he is charged

1    in a marijuana conspiracy with Mr. Mitchell.

2              THE COURT:  I understand.

3              THE WITNESS:  I'm just trying to be truthful.

4              THE COURT:  Yes, ma'am.  And I appreciate that.

5    That's all we ask of you.

6              THE WITNESS:  Okay.

7    BY MS. MAZZANTI:

8    Q   And you subsequently -- you indicated to law enforcement

9    that you actually went to this location where you saw the

10   trash bags --

11   A   Yes.

12   Q   -- being unloaded or loaded into the vehicle?

13   A   Yes.  That was during the time when my son had -- was in

14   the house and it got busted, and I knew that my son -- it

15   wasn't his stuff.

16   Q   Okay.  And but you don't recall indicating to

17   investigators that your son was actually engaged in the drug

18   trafficking with Mr. Sherrod -- or with Mr. Mitchell and Mr.

19   Alexander at all?

20   A   Every -- every time that I -- I assumed it.  You know, it

21   doesn't take a scientist.  I was always wondering what they

22   were doing hanging with someone so young as my son, you know.

23   He never had anything to indicate -- he didn't have anything

24   but clothes, you know.

25   Q   Your son even went to -- to Mexico; is that right?

1  A   Yes, I saw the pictures on Facebook and I approached my

2  son about that.  Yes.

3  Q   All right.  And who was he going -- do you recall who he

4  went to Mexico with?

5  A   Machita Mitchell.

6  Q   Okay.  And then, at some point, you became aware of an

7  issue that arose between Chris Alexander and Mr. Mitchell and

8  your son?

9  A   What type of issue?  I don't -- I mean, yeah, well, they

10 -- yeah.

11 Q   At some point, was your son afraid that Mr. Alexander was

12 going to try to have him killed?

13 A   Everybody was saying it, and I also heard it, as well.

14 So, yes, I can -- I can say yes.

15 Q   Okay.  And as you understood it, did that relate to an

16 issue that they had -- a disagreement that they had or some

17 issue that they had about the marijuana trafficking that they

18 were engaged in?

19 A   Yes --

20 Q   Okay.

21 A   -- I guess they were getting into it, him and Machita was

22 -- Frog was getting into it, and then, you know, my son, by

23 him hanging with Machita, it was just all there together.  He

24 target -- he started targeting my son once Machita had got

25 locked up.

1  Q   Okay.  And as you understand it, that that in part relates

2  to the murder of Mr. Alexander's son, Cyncere?

3  A   Well, I -- I'm not sure exactly what it was about, but

4  maybe it was.  He was accusing everybody of having something

5  to do with Cyncere's murder.  Cyncere stayed with us, you

6  know, and was a -- kind of like a part of the family.  So he

7  -- he was just -- Chris was just blaming everybody.  The truth

8  be told, he had ran off with a -- millions of dollars of the

9  Mexican's money and drugs.

10 Q   Okay.  And you have a small child that lives in the house

11 with you?

12 A   Yes, I do.

13 Q   And you're not concerned that someone might try to

14 retaliate against your son and something might happen to the

15 people living in your house?

16 A   As of right now, with the -- with the investigation, with

17 the indictments that's been going on in the city, I can say

18 there's not a creature stirring, not even a mouse, and so I do

19 feel safe for my son, as long as he get out and go to work,

20 get him a job.  But if he can't do that, he will -- his

21 probation officer will be notified and he will be back in

22 federal custody, and that's on my deceased son.

23 Q   Okay.  And your son has a habit of being in possession of

24 firearms; is that right?

25 A   I'm -- I'm scared of them.  I'm scared of them.  He likes

1    guns.

2    Q    Uh-huh.

3    A    He's been like that since his brother passed away.

4    Q    Okay.  Are you familiar with your son's Facebook page?

5    A    Somewhat.  He's had -- he has me blocked.

6    Q    Okay.

7            MS. MAZZANTI:  Your Honor, may I approach?

8            THE COURT:  You may.

9    BY MS. MAZZANTI:

10   Q    I'm going to show you Government's Exhibits A and B.  If

11   you can --

12   A    Okay.

13   Q    -- can you tell me what Government's Exhibit A is?

14   A    It is -- it is my son, and it is his childhood friend,

15   Jaylyn.

16   Q    What's Jaylyn's last name?

17   A    Griffin [sic].

18   Q    And there's a firearm in that photograph?

19   A    Yes.  Jaylyn is holding it.

20        (Government's Exhibit A identified.)

21   BY MS. MAZZANTI:

22   Q    Okay.  And then, Government's Exhibit B?

23   A    I'd never seen this, today -- I never -- I just seen it

24   when Ms. Gray showed it to me, but I hadn't never seen that

25   one.

1   Q    Okay.  But what does the picture reflect?

2   A    It is serious; a gun, it looks like, and a speaker.

3        (Government's Exhibit B identified.)

4   BY MS. MAZZANTI:

5   Q    Okay.

6   A    But he -- you know, he never was a felon, so I -- I guess

7   he felt like it wasn't against the law to carry them.  I don't

8   know.  Because he wasn't a felon at the time.

9   Q    Okay.

10  A    He has no felons.  He had no record until now.

11  Q    Okay.

12          MS. MAZZANTI:  May I have just a moment, Your Honor?

13          THE COURT:  You may.

14          MS. MAZZANTI:  May I approach?

15          THE COURT:  Do you want to move to admit those?

16          MS. MAZZANTI:  Yes, Your Honor.  Move to admit A and

17  B.

18          THE COURT:  Objection?

19          MS. GRAY:  No objection.

20          THE COURT:  All right.  Admitted.  Thank you.

21      (Government's Exhibits A and B received.)

22          MS. MAZZANTI:  That's all I have, Your Honor.

23          THE COURT:  Redirect?

24                        REDIRECT EXAMINATION

25  BY MS. GRAY:

1   Q   Ms. Williams, let's go back a little bit.  Where was Chris

2   -- excuse me -- where was Kenwan living before he was arrested

3   -- before this June incident happened, where was his --

4   A   With his girlfriend, Jamia --

5   Q   Okay.

6   A   Fairchild.

7   Q   And was that a residence here in Little Rock?

8   A   Yes.

9   Q   Okay.  And now, if he's released, he'll live where?

10  A   With me.

11  Q   Okay.

12  A   Yes, ma'am.

13  Q   The place where this -- the incident supposed to happen

14  for which he's charged now --

15  A   Uh-huh.

16  Q   -- happened at a home in Pecan Lake?

17  A   Uh-huh.

18  Q   Is that your home?

19  A   No, it's not.

20  Q   And was that Kenwan's home?

21  A   No, it was not.

22  Q   Okay.  Let's go back to Chris Alexander.  How old is Chris

23  Alexander, would you guess?

24  A   He should be around 43 years old.

25  Q   Okay.  And Chris [sic] is 21, correct?

1   A   No.  No.  Chris --

2   Q   I'm sorry.

3   A   Kenwan is 21.

4   Q   Kenwan is 21?

5   A   Yes.

6   Q   And Chris Alexander is, you said, about 43?

7   A   40-something.  42/43.

8   Q   Where is Chris Alexander now?

9   A   He is now in federal custody.  He's been indicted.

10  Q   Okay.  So he's locked up?

11  A   Yes.

12  Q   Okay.  And then, Machita Mitchell, how old is Machita?

13  A   43 or 44.

14  Q   Okay.  And again, Kenwan is 21, correct?

15  A   Yes.

16  Q   Where is Machita Mitchell?

17  A   He's also indicted, in the federal custody.

18  Q   So he's locked up also?

19  A   Yes, he is.

20  Q   Okay.  There has been talk about drug transactions and

21  drug activity?

22  A   Uh-huh.

23  Q   Did you, yourself, ever witness any drug transaction

24  between Kenwan and anyone?

25  A   No, not between Kenwan.

1   Q    Okay.  Did you ever overhear a conversation of selling

2   drugs between Kenwan and anybody else?

3   A    Kenwan whether -- no, Kenwan wouldn't --

4   Q    Okay.

5   A    -- dare let me hear that.

6   Q    Let's go back to, I believe, Government's 1 [sic].

7             MS. GRAY:  May I approach?

8             THE COURT:  You may.

9             MS. GRAY:  Let me see their exhibits.  I'm not

10  certain --

11            THE COURT:  I think it's A and B.

12            MS. GRAY:  A and B.  Thank you.

13            I'm showing the witness what's marked as Government's

14  A.

15            THE WITNESS:  Uh-huh.

16  BY MS. GRAY:

17  Q    Do you recognize the people in that -- in that picture?

18  A    Yes, I do.

19  Q    Who are they?

20  A    My son, Kenwan, and Jaylyn Griffin [sic].

21  Q    Okay.  And is your son holding a firearm?

22  A    No, he's not.

23  Q    Okay.  And who is Jaylyn Griff -- who is Jaylyn Griffin

24  [sic]?

25  A    Childhood friend.

1   Q    Okay.

2             THE COURT:  Do you know where that photo was taken?

3             THE WITNESS:  Let me see.  I -- I'll look at the

4   background.  No.  I don't notice that background.

5             THE COURT:  Okay.  And I'll have the same question on

6   the next one.

7             MS. GRAY:  Okay.

8   BY MS. GRAY:

9   Q    Do you know when that photo was taken?

10  A    No.

11  Q    Okay.  Now, Government's Exhibit B, did you recognize that

12  at all?

13  A    No.  I mean, I -- I mean, when you guys showed it to me.

14  Q    Was that taken in your home?

15  A    No.

16  Q    Okay.

17  A    Uh-uh.

18  Q    Is there anybody holding that gun?

19  A    No.

20  Q    Okay.  Now, you appeared at the U.S. Attorney's Office

21  back in January of this year?

22  A    Yeah.  Yes, ma'am.

23  Q    What prompted you to go there?

24  A    I actually wanted to shine some light on what type of

25  child he really was.  I guess I was desperate.  And I just

1  felt like the way they got him, they were real respectful, on

2  not hurting me, like they'd taken my child out in front of me,

3  and I felt like that I wanted to kind of iron out what the

4  story was really, you know, put the pieces to the story

5  together and let them know, look, this is -- this is not who

6  my child is.  I know my child is very stubborn and I know he's

7  very fearful right now of what's going to happen to him if he

8  happens to go to prison, you know.  And I just wanted to let

9  them know that those drugs was not my son's.  Those drugs was

10 Christopher Alexander's and Machita Mitchell.

11 Q    Okay.

12 A    And he just -- he just -- my son just was looking for a

13 father role model and -- and just ran across the wrong one,

14 and -- and they manipulated it and -- and used him.

15 Q    How did your son change after his brother's 2014 death?

16 A    I lost him.

17 Q    Okay.  What do you mean?

18 A    I was sick.  I couldn't be there for him like I would.

19 I'm a real strong person.  And he couldn't stand to see me

20 hurt, so he just went to the streets, you know.  [Crying.]

21 Q    Okay.  Now, how far apart in age was --

22 A    Three years.

23 Q    Okay.  Between Kenwan and Bernard?

24 A    Uh-huh.  Yeah.

25 Q    Okay.  Do you think that Kenwan could also benefit from

1   some counseling?

2   A   Yes, he does.  We -- everybody in the family went to

3   counseling, but Kenwan didn't want to go, you know.  And I

4   felt like he didn't ever deal with his brother's death, you

5   know.

6   Q   Okay.

7   A   I did.  I got help.  I got diagnosed.  You know, my

8   daughter did the same.  But Kenwan was so far out there, you

9   know, I couldn't grab him no more.  And I ended up getting

10  real sick.  I went for four years without being treated.  The

11  guy that killed my son -- that helped kill my son, came to the

12  repass, and my son's, that is deceased, best friend gunned him

13  down and he died in my arms.  And I -- I went on thinking that

14  I was normal.  And I kind of lost myself, you know.  So I went

15  to the hospital, and I stayed in the hospital for several

16  weeks, and they monitored me and they diagnosed me.

17  Q   What was your diagnosis?

18  A   I'm PT -- PTSD, and I suffer from manic depression.

19  Q   Okay.  Have you since been given medication for those

20  illnesses -- I don't -- don't show me.

21  A   Oh, okay.

22  Q   Just have you been --

23  A   Yes.

24  Q   -- given prescriptions?

25  A   Yes.  I've been on my medication for almost a year.

1  Q   Okay.

2  A   And that's when I -- I -- it was almost just like waking

3  up, and then it's like my son was too far gone with these

4  people --

5  Q   Okay.

6  A   -- and so I started getting my mind back, and I started

7  getting -- you know, the medicine started helping me, and so

8  that's when I started reaching out and investigating the

9  people that he was hanging around with, because my fear was

10  that he was going to get hurt, you know.

11  Q   Do you still have that fear now?

12  A   No.  No.

13  Q   Okay.  So, the -- the question that, I'm sure, concerns us

14  all is, you -- you admit that, at one point, you lost control

15  of Kenwan?

16  A   I did.  I lost -- I lost me.

17  Q   Okay.

18  A   I lost me.

19  Q   Now, if Kenwan is to be released, he'll be under the

20  supervision of a probation officer; is that your

21  understanding?

22  A   Yes, it is.

23  Q   And he'll also be under your supervision; is that correct?

24  A   Yes.  Yes.

25  Q   And you do not work?

1   A   I do not work.

2   Q   Do you think the situation then will be changed now, as

3   before, when you felt like you'd lost control of Kenwan?

4   A   Yes, because the main issues was his friends.  He thought

5   that his friends was his friends, and he see that they're not

6   his friends.  And so, I think he's on a whole 'nother level

7   now.

8   Q   Okay.

9   A   My baby -- I hadn't heard my son cry in years.

10  Q   Okay.

11  A   And when they got him, he was tore up, so.

12  Q   Okay.

13  A   I think that he'll be okay, because they're not -- nobody

14  is coming to my house.  Nobody is allowed to come to my house.

15  Q   Okay.

16  A   And if he's not at work or at school, he's going to be at

17  my house.  I don't have no problem, because I'd rather sit

18  here and look at you guys, and cry my eyes out, than to have

19  to bury my son.  I've lost already.  I've lost already.  I'm

20  not trying to lose again.

21  Q   Okay.

22  A   So, if that means me seeing him going down the wrong path

23  -- Kenwan don't have no problem with calling y'all, he knows

24  it.

25  Q   Okay.  Do you have any issue with Kenwan being on an ankle

Williams - Redirect/Recross                    30

1  monitor or electronic or home detention?

2  A    No.

3  Q    Okay.  So you're okay with him being confined to your

4  home?

5  A    Yeah.

6  Q    Okay.

7        MS. GRAY:  That's all I have, Your Honor, of this

8  witness.

9        THE COURT:  Redirect [sic]?

10        MS. MAZZANTI:  Just one clarifying question.

11                    RECROSS EXAMINATION

12  BY MS. MAZZANTI:

13  Q    You actually came out to the FBI, not the U.S. Attorney's

14  Office; is that right?  When you came out in January, you came

15  out to the FBI, not the U.S. Attorney's Office?

16  A    Yes, it was the FB -- I -- I don't know what -- it was a

17  scary office.  I don't know what office it was.

18  Q    Okay.  All right.

19  A    Was it the FBI?

20  Q    I was just trying to clarify for the record, I think you

21  agreed with Ms. Gray that you came to the U.S. Attorney's

22  Office.  Did you go out to West Little Rock to meet with --

23  A    Yeah.  Yeah.  It was -- it was off Shackleford.

24  Q    Okay.  Thank you, ma'am.

25  A    Uh-huh.

1    MS. MAZZANTI:  No further questions.

2    THE COURT:  Ma'am, a couple of questions for you.

3    And I'm going to let the attorneys ask redirect if

4    they -- if they want to.  So, I get a report before we come

5    out here.

6    THE WITNESS:  Uh-huh.

7    THE COURT:  And one of the things, my customary

8    practice is to make it a part of the record.  And let me ask,

9    counsel, any objection to making the report and the addendum a

10   part of the record for today's hearing?

11   MS. MAZZANTI:  No, Your Honor.

12   MS. GRAY:  None from the defense, Your Honor.

13   THE COURT:  Okay.

14   BY THE COURT:

15   Q    And in it, it says that your son started using cocaine and

16   marijuana at the age of 17.

17   A    Oh, no, my baby don't do no drugs.

18   Q    Really?

19   A    No.

20   Q    Well, do you know why the Pretrial Services Report says

21   that?

22   A    Why?

23   Q    Because your son would have told them that.

24   A    He don't -- he don't have no drugs in his system.

25   Q    Well, I would think now he wouldn't, since --

1   A    Look, I might be just being a mom.  But when they tested

2   him, when he first came -- you know, they got him, he wasn't

3   -- he wasn't dirty -- I don't think he was dirty.  He was

4   dirty?

5   Q    I don't know the answer to that.

6   A    Y'all -- y'all --

7            THE COURT:  The officer can tell us.

8            MS. McCONNELL:  He tested presumptively positive for

9   cocaine on the day of court.

10           THE COURT:  Okay.

11  BY THE COURT:

12  Q    All right.  Well, let me move to my next question.  And

13  like I say, you do seem like you -- you're being honest and --

14  and you're genuinely -- you're clearly interested in the

15  safety of your son and his well being.  But I also think that

16  there's a little too much of you going along with your son on

17  this.  But you had a weird reaction, and I just need to ask

18  you, because when you were asked by Ms. Gray about your son's

19  father --

20  A    Uh-huh.

21  Q    -- and whether he was a Wolfe Street Crip --

22  A    Uh-huh.

23  Q    -- and you said, "I don't know, but he's a Crip."  And

24  then you smiled, like -- kind of like it was a badge of honor,

25  and, I don't know --

1  A   No.  No.

2  Q   -- I want to --

3  A   No.  No.

4  Q   -- not misunderstand what happened there.

5  A   No.  No.  I smiled because they have so many different --

6  little different blocks and stuff, and I really don't know

7  what set he was from.

8  Q   Okay.

9  A   But I do know he is -- you know, was -- is a Crip.  But I

10 don't think it's -- I don't think it's Wolfe.  I think it's

11 some other, Rolling something, but it ain't Wolfe Street.

12 Q   Okay.  But you knew -- you knew your son was ganging --

13 knew he was gangbanging, right?

14 A   Yeah, I -- I knew that he had eventually started, you

15 know, going that way, wearing blue, you know, hanging with the

16 wrong people, trying to really basically follow footsteps.

17 Q   What were you doing to try to pull him in a different

18 direction?

19 A   Well, like I stated, Your Honor, I wasn't together.

20 Q   Okay.

21 A   I wasn't together.  And he knew that I didn't have the

22 strength to pull him together, because I was sick, you know.

23 And then, once I got help, and went to the hospital, and then

24 started going to counseling, I -- that's when I started waking

25 up, like, hey, he -- he's too far gone, all this stuff

1  happening in the streets, you know, and so I started taking my

2  medicine, and then I started hammering down on him, "Kenwan,

3  where you at; what you doing?  I need to know you -- I need to

4  know you -- I need to see you in the light and in the day."

5  When all that stuff started happening.

6      Now, if he tested for cocaine, that was something that I

7  totally wasn't aware of.  And that may have been the reason

8  why he was straying away from me, because I'm very in tune

9  with my children, you know.  And so, we --

10 Q   Fair enough.  All right.  Now let me ask you, you said he

11 posted a hundred thousand dollar bond?

12 A   Yes.

13 Q   How was that possible?

14 A   We actually didn't have to pay for the hundred thousand

15 dollar bond.  We actually knew a -- a family member, that's

16 kind of close to a bondsman.  We owe him still now.  He didn't

17 take nothing.  Kenwan had a old car and we sold that.  And

18 that was 2,500.  And to be honest, the man only had -- they

19 got 3,000 dollars in all, and he's taking payments.  We've

20 been paying him since Kenwan been locked up.  We're hoping

21 that he will be released, so that he wouldn't get off the

22 bond.  We didn't come up with a big lot -- a lot of money,

23 because I don't have a lot of money.

24 Q   Okay.  But I was just curious about how that worked out.

25 A   Yeah.

1  Q   Okay.

2  A   Yeah.  I'm not -- I'm not proud of him being in no --

3  Q   I understand.  No, I don't -- I don't assume that you are.

4  A   Yeah.

5  Q   You had a weird reaction, I needed to ask you that.

6  A   Yeah.

7  Q   So, your -- your response was --

8  A   Because I didn't want to be -- I didn't want her to trick

9  me, like, you know, I -- it wasn't Wolfe -- I don't think he's

10 from Wolfe Street.  I think this is just something that Kenwan

11 --

12 Q   Right.

13 A   -- went and got connected with these people on his own,

14 and --

15 Q   Fair enough.

16 A   -- yeah, because his daddy was actually too -- is upset,

17 very upset.

18 Q   All right.

19        THE COURT:  Any questions based on my questions?

20        MS. MAZZANTI:  No, Your Honor.

21        MS. GRAY:  No, Your Honor.

22        THE COURT:  All right.  You may stand down, ma'am.

23 Thank you.

24        THE WITNESS:  Thank you, Your Honor.

25     (Witness stands down.)

1          MS. GRAY:  Your Honor, the defense calls Steven

2    Green.

3        STEVEN GREEN, DEFENDANT'S WITNESS, SWORN.

4                        DIRECT EXAMINATION

5    BY MS. GRAY:

6    Q    Mr. Green, state your name and your position for the

7    record.

8    A    Steven Green.  I'm an investigator with the Federal Public

9    Defenders Office.

10   Q    Have you done some investigation work on Kenwan Sherrod's

11   case?

12   A    Yes.

13   Q    He was arrested back on September 12th, 2017, in Pulaski

14   County, for his pending Pulaski County court case.  Have you

15   made contact with the bondsman on that case?

16   A    Yes.

17   Q    Who is that bondsman?

18   A    Jolliett Starks.

19   Q    And what did your contact with Mr. Starks consist of?

20   A    I asked Mr. Starks would he be willing to stay on the

21   bond, and he said yes.

22   Q    Okay.  And is Kenwan in good standing with Mr. Starks?

23   A    Yes.

24   Q    Okay.  And then, were you given information about Mr.

25   Sherrod's employer?

1   A    Yes.

2   Q    Who was -- who is his employer?

3   A    Ron Smith.

4   Q    Okay.  Is that -- he's a construction company?

5   A    Yes.  He -- he works with from the ground up construction.

6   Q    Okay.  And so, was Kenwan employed by Mr. Smith?

7   A    Yes.

8   Q    And is he willing to hire Kenwan again?

9   A    Yes.

10  Q    Okay.  And do you have the contact information for both

11  the bondsman and Mr. Smith?

12  A    I do have the phone numbers.

13  Q    Okay.

14          MS. GRAY:  Your Honor, we will provide that to the

15  Court if the Court wants it.  No further questions, Your

16  Honor.

17          THE COURT:  Cross?

18          MS. MAZZANTI:  No, Your Honor.

19          THE COURT:  All right.  Thank you, sir.  You may

20  stand down.

21      (Witness stands down.)

22          MS. GRAY:  Your Honor, that's all the evidence that

23  we have to present from the defense.

24          THE COURT:  Well, the -- it's the burden of

25  production, not the burden of persuasion.  You know, I do have

Schmeckenbecher - Direct                          38

1  some concerns about the proposed living condition.  But I

2  think the proposal, with electronic monitoring, ekes you over

3  the -- the bar here on the presumption, so I will -- I'll turn

4  it over the United States Attorney and let you proceed, if you

5  so choose.

6         MS. MAZZANTI:  Officer Chris Schmeckenbecher.

7      CHRIS SCHMECKENBECHER, GOVERNMENT'S WITNESS, SWORN.

8                     DIRECT EXAMINATION

9  BY MS. MAZZANTI:

10 Q   Will you please state your name?

11 A   It's Chris Schmeckenbecher.

12 Q   How are you employed?

13 A   I work for the Pulaski County Sheriff's Office, but I am

14 currently assigned to the FBI Gang Task Force.

15 Q   And are you familiar with the investigation surrounding

16 Kenwan Sherrod?

17 A   Yes, I am.

18 Q   And if you could, tell the Court about -- just generally,

19 about the facts that support the offense in the indictment in

20 this case.

21 A   Okay.  On or -- on or about June 13th, 2017, Little Rock

22 VCAT units, along the Arkansas Department of Community

23 Corrections, went to a residence of Machita Mitchell, at 5902

24 Timberwood [sic] -- or, I'm sorry, Timberview Road, in Little

25 Rock.  Mr. Mitchell was on probation or parole and had a

1  search waiver on file.  They went to do an in-home visit or an

2  in-home check.  When they arrived, they knocked on the door

3  for several minutes, they heard commotion inside, but nobody

4  really answering the door.  Finally, Mr. Mitchell's wife,

5  Detra, answered the door.  They were allowed into the home.

6  They discovered Kenwan Sherrod, Jaylin Griffis, Detra

7  Mitchell, Machita Mitchell, and I believe several of Machita

8  and Detra's children at the home.  The -- the gentleman,

9  Jaylin Griffis, was found to be in possession of

10 ten-millimeter firearm, which they secured for their safety

11 while they continued their search.

12      During their search, they located a -- a Glock 21 pistol,

13 a .45 caliber, it was in plain view on a top of a pair of

14 shoes on the floor in the living room.  Without provocation,

15 Mr. Sherrod said, "That's mine," to the officer.

16      They also located some marijuana in the living room.  And

17 they located a loaded Smith & Wesson .40 caliber pistol inside

18 the -- between the cushions of the couch.

19      At a later time, they located numerous firearms boxes that

20 were empty, but indicated, you know, they were -- they were

21 from the manufacturer, boxes that firearms would come in.

22 Q   And that .40 caliber Smith & Wesson, did Mr. Sherrod

23 subsequently sign a sworn affidavit claiming that firearm?

24 A   Yes, he did.

25 Q   All right.  And with respect to the .45 caliber pistol

1  that Mr. Sherrod originally stated was his, did Mr. Griffis

2  subsequently try to claim that firearm, but said it was on the

3  couch, rather than in a shoe?

4  A   Yes, he did.

5  Q   All right.  And in addition to those items that were found

6  in the living room, what other items did probation and VCAT

7  locate in the home?

8  A   Okay.  They located, in a garage area, several tubs,

9  plastic crates, containing trash bags with suspected

10 presumptive marijuana.  At that point, they did a -- backed

11 out and did a search warrant on the home.  They continued to

12 search the home.  They found numerous items of drug

13 paraphernalia, scales, smoking pipes, drug ledgers, indicating

14 who narcotics were being sold to, who owed what, extended

15 magazines for firearms.  They located over -- there was

16 approximately 86 pounds of marijuana, total, recovered.  In a

17 closet in a bedroom, there was located, on a top shelf, a

18 Smith & Wesson M&P .40 caliber pistol, along with a bag

19 containing somewhere roughly around a pound or so, about 314

20 [sic] grams of marijuana.  There was also --

21 Q   214 grams --

22 A   -- a safe -- excuse me?

23 Q   Is that 214 or 314?

24 A   I've got in my notes 214.

25 Q   Oh, okay.  Sorry.

Schmeckenbecher - Direct                               41

1  A    Okay.

2  Q    I think you said three hundred.  I just wanted to make

3  sure.

4  A    Oh, I'm sorry.

5         THE COURT:  I think -- well, I don't know.  I thought

6  he said 214, but I may have missed it too.

7         MS. MAZZANTI:  Sorry, my fault.

8  BY MS. MAZZANTI:

9  Q    All right.  So you found a loaded Smith & Wesson .40

10 caliber pistol on the shelf, and right next to it, a gallon

11 Baggie -- or a Baggie full of a distributable quantity of

12 marijuana?

13 A    That's correct.

14 Q    Okay.

15 A    Additionally, they found a safe in a closet that contained

16 about 23,750 dollars cash.

17 Q    And related to that Smith & Wesson M&P, was that firearm

18 reported stolen?

19 A    Yes, it was.  That was -- that firearm, serial number

20 DWU0161, was reported stolen out of Little Rock, Arkansas, in

21 a robbery that took place at the Big Daddy's Pawn Shop.

22 Q    And if you could, on July 5th of 2017, was there a

23 recorded jail call between Mr. Mitchell and Mr. Sherrod that

24 related to that specific firearm?

25 A    Yes, there was.  On -- on July 5th, 2017, Mr. Mitchell

1   contacts Sherrod, and they're -- they're -- there's numerous

2   conversations going on, but at some point, they get into a

3   miscommunication and Mitchell said something about, "I didn't

4   say Vic Daddy, I said Big Daddy, Big Daddy's Pawn Shop."  And

5   Sherrod went on to say, "Well, you know, that's mine."  And

6   Mitchell said, "Well, I don't know.  Whatever strap they

7   charged me with came back to that."  And Sherrod says, "What

8   the hell?"  And then Sherrod asked if they were charging

9   Mitchell with theft by receiving.  Mitchell says, "Yes, and

10  the warrant should be coming down for that."  Sherrod then

11  replies, "I'm tryin' to see, you know what I'm sayin', that

12  M&P, that's crazy."  And there was only one M&P that was found

13  in the -- in the house, and that was the stolen firearm that

14  was located on the top of the closet next to the marijuana.

15  Q   And a strap is -- is slang for a firearm?  Whenever he

16  referred "whatever strap they charged me with."

17  A   Oh, strap.  Yes.  Strap is another slang term for a

18  firearm or a gun.

19  Q   All right.  And so, essentially, in that conversation, Mr.

20  Sherrod was indicating that that firearm was his?

21  A   Initially, yes.

22  Q   Okay.  And in addition to those items that you've

23  previously discussed that were recovered during that search

24  warrant, were there also a number of firearms boxes?

25  A   Yes.  Numerous firearms boxes with indicated

Schmeckenbecher - Direct                                          43

1   manufacturer's serial numbers, et cetera, some firearms

2   manuals that went with those boxes.

3   Q   And the individuals that returned on the trace on those

4   firearms, did they have a known association with Mr. Mitchell,

5   Mr. Alexander, and Mr. Sherrod?

6   A   Yes, they did.  As a matter of fact, Cory Combs was one of

7   the purchasers.  A Tori Combs was a purchaser.  Tori Combs was

8   found during a search warrant that took place on May 5th,

9   2015, I believe at the residence of Chris Alexander.  So the

10  association with the people that were registered on those

11  firearms, or the purchasers of those firearms, were known

12  associates of Mr. Sherrod.

13  Q   And the -- but those actual firearms were not recovered in

14  this incident, just the gun boxes?

15  A   That is correct.

16  Q   And Mr. Mitchell did give a statement claiming the

17  marijuana at the residence; is that right?

18  A   That's correct.  He says that the marijuana there was all

19  of his.  He said that he was the only one that had a key.  It

20  apparently was in a locked area of the home or a locked --

21  something with a lock on it, and he said he was the only one

22  with a key, he was the only one that had access to it, and

23  that it was all his.

24  Q   Okay.  All right.  In a jail call in June of 2017, is

25  there a conversation between Mr. Mitchell and Mr. Sherrod

1  relating to taking responsibility for the various items in the

2  house?

3  A   Yes, there is.  They're -- they're talking -- but Mitchell

4  calls a woman we believe is Kelsey Williams, and she is

5  either, I  believe, in close proximity to Sherrod, she -- he's

6  passing messages to her, and then eventually Mr. Sherrod gets

7  on the phone with him.  Mitchell asked, "Why they didn't take

8  the other motherfuckin' Smith & Wesson?  They just left that

9  motherfucker on me."  He said, "I took that other

10  motherfuckin' weed shit and they just left that gun charge on

11  me.  They should have claimed all the guns instead of just one

12  particular one.  They have him -- they -- they have him still

13  stuck with the guns."  He then tells Sherrod he forgot about

14  the silver and black .40.  Mitchell says that Jaylyn took two

15  of the guns, why didn't Sherrod take two guns?  And then he

16  goes on to state, "I -- they know I couldn't get caught with

17  that motherfucker."  Sherrod says that he took the black .40.

18  He said, "I took the black .40.  That's mine."  Sherrod says,

19  "The Glock is in Jaylyn's name."

20  Q   And then do they discuss that Murda, who is the nickname

21  for Chris Alexander, needs to send some money on his books?

22  A   Yes, he goes on to say that Murda needs to send some

23  money, put -- put some money on his books for two or three of

24  those things.  He says he wants to make sure he keeps

25  Mitchell's phone safe, delete some text messages and destroy

1   it.  But going back to "two or three of those things," they

2   were in -- we believe they were in a drug trafficking

3   organization together.  Even Ms. Williams testified that she

4   knew that they were partners in a drug trafficking

5   organization.  And we believe "two or three -- or three or

6   four of those things" were probably three or four pounds of

7   marijuana that were owned or two or three thousand dollars,

8   probably one of those things, because he's talking about

9   wanting money put on his books.

10  Q   But Mr. Mitchell did indicate to Mr. Sherrod that while he

11  was out, that he wanted him to -- to make sure his phone was

12  safe and potentially delete text messages and even destroy his

13  phone, if necessary?

14  A   If necessary, yes.

15  Q   All right.  All right.  And then on August 15th of 2017,

16  did Mr. Sherrod testify in a hearing in Pulaski County Circuit

17  Court for Mr. Mitchell?

18  A   Yes, he did.

19  Q   And did he indicate that two of the guns in the house

20  belonged to him?

21  A   Yes.

22  Q   And he also indicated that two belonged to Mr. Griffis?

23  A   That's correct.

24  Q   And at that time, he acknowledged that he was associated

25  with the Wolfe Street Crips?

1    A    Yes, he did.

2    Q    And that Mr. Mitchell is a known Wolfe Street gang member?

3    A    That's correct.

4    Q    All right.  Just, if we can go back a little in time, in

5    February -- around February 2016, going forward, were there

6    some incidents involving Mr. Mitchell and a couple of

7    individuals, Tyrone Nutt and Loretta Threadgill?

8    A    Yes.  Sometime in February of 2016, there was an incident

9    -- well, let me go back even further.  We've heard rumors that

10   -- and talk from numerous sources and street connections that

11   Mr. Mitchell -- or Machita Mitchell had a large quantity of

12   currency stolen from out of his house.  They believed it was

13   linked to possibly Tavaris Canady -- or I'm sorry -- Tavaris

14   Canady, John Nutt, and Tyrone Nutt.  So, in February of 2016,

15   two individuals show up at the home of Tyrone Nutt, and they

16   have firearms, and they're making all sorts of threats and

17   things like.  Mr. Nutt identified them as Frog and Murda.  He

18   said that they both had firearms with them and were

19   threatening them.  Frog is, of course, the street name for

20   Machita Mitchell.  Murda is the street name for Chris

21   Alexander.

22   Q    Okay.  And subsequently, when Mr. Mitchell was arrested,

23   did Mr. Sherrod make a statement about what he might do; did

24   he indicate that he would take care of it?

25   A    Yes, he did.  Yes, he did.  I'm sorry.

1  Q   All right.  And then what other information do you have

2  about Mr. Sherrod's involvement regarding the witness bribery

3  issue?

4  A   Okay.  So, related to this same incident, this terroristic

5  threatening, where Mr. Nutt was the victim, on or about, I

6  believe it was, September 5th of '17, we began to hear

7  telephone calls made by Mr. Mitchell to Mr. Sherrod.  I spoke

8  with the prosecuting attorney's office that day and they said

9  that Mr. Nutt was attempting to reach out to them and possibly

10 to have charges -- have charges dropped against him in that

11 terroristic threatening case.  As we listened to these phone

12 calls, several came up that were of note.  If I can refer to

13 my notes?  The first call that I listened to was on September

14 5th, 2017, where Mr. Mitchell calls his wife, Detra, and

15 during the conversation, he has her contact somebody they

16 refer to as Tang Tree, which we later discovered is Tyrone

17 Nutt.  They contact -- he tells her to call that number at --

18 ending in zero -- or 7099, which police -- Little Rock Police

19 records indicate Nutt's telephone number ends in 7099.  After

20 the male we believe to be Nutt gets on the phone, he tells

21 Mitchell that he did go up to the prosecutor's office today,

22 but that he wasn't able to drop those charges because they

23 couldn't meet with him that day.  He said he's going back up

24 there tomorrow.  Then he goes on to tell Mitchell, "It ain't

25 about the money though, bro.  And we didn't go -- I tried to

1  tell that woman I ain't tryin' to press no charges.  We didn't

2  go up there to press no charges."  They go on and talk about

3  how he was going to tell the prosecutors that he didn't see

4  Mitchell with a gun and it must have -- that it was just

5  somebody else with a gun, it was just a mis --

6  miscommunication.

7      At a later time, there was a telephone call made the day

8  before, in which he -- in which he -- again, Mitchell contacts

9  his wife, Detra, and Detra tells him, "Mr. Mitchell needs the

10 two-fifty."  And Mr. Mitchell, we are assuming is Machita

11 Mitchell's father, Machita Mitchell, Sr.  She goes on to say,

12 "I guess a deal is a deal.  Do you want me to call your dad?"

13 We believe she was referring to the money that they needed to

14 pay Nutt.  Soon after, Mitchell's dad gets on the phone and

15 tells him to call Booman and tell him I told you to get that

16 money out of my shit.

17     Mitchell later tells his father that, "Don't give it to

18 him until when you go and show the goddamn money, but you

19 don't give it to him until he comes out with that paper."

20 With basically the paperwork proving that he did it.

21     In another call, on September 5th, Mitchell was arguing

22 with his dad about forgetting to get money from Booman -- or

23 I'm sorry -- he says, "Booman," which is Kenwan Sherrod.  He

24 says, "You know, the man said to bring two-fifty to seal the

25 deal."  Mitchell reminds his wife to have Mr. Mitchell, which

1    is Machita's father, call Booman.

2        Another phone call, also on that same date, Mr. Machita

3    Mitchell has his wife, Detra, three-way call Mr. Sherrod.

4    When Mr. Sherrod gets on the phone, he tells Mitchell, "I'm

5    about to pull up and drop the money off now."  And Mr.

6    Mitchell -- or Machita Mitchell tells him, "Well, drop that

7    money off then 'cuz we're gonna handle that business with that

8    motherfucker."

9        At this point, between conversations with myself and the

10   prosecuting attorney's office, we believed that there was a

11   scheme in play to pay off Mr. Nutt into dropping charges

12   against Mr. Mitchell.  We believe that Detra Mitchell, Machita

13   Mitchell's father, and Kenwan Sherrod, all played an active

14   role in the scheme to either collect the money, deliver the

15   money, or pass messages along to continue that scheme to

16   -- to bribe the witness off.

17   Q   Okay.  All right.  And then just going back, there's a

18   period of time, after this June 13th, 2017 incident where the

19   drugs and guns were recovered and a time where Mr. Mitchell

20   went back into jail, where they were out and went to --

21   according to an interview with Tyler Jackson, did Mr. Sherrod,

22   Mr. Mitchell, and Jaylin Griffis attend the Power Ultra Lounge

23   show where there was the mass shooting incident?

24   A   Yes.

25   Q   And what information, that relates to Mr. Sherrod, did Mr.

1   Jackson provide?

2   A    Okay.  We were told by Mr. Jackson that Mr. Sherrod, Mr.

3   Mitchell, and Jaylyn had all gone to the club together.  We

4   were told that Mr. Sherrod had a gun, Mr. Machita Mitchell had

5   a gun, and Jaylyn had a gun.  We were told that Frog, or

6   Machita Mitchell, gave a ten-millimeter pistol to TJ.  He told

7   us that Mr. Sherrod was in possession of either a Mack 11 or a

8   Tech.  And, but that he told him when the incident told place,

9   he tried to shoot it, but it jammed.

10  Q    Mr. Sherrod told TJ that he tried to shoot it, but it

11  jammed?

12

13  A    That's correct.  That's correct.  The incident leading up

14  to this was basically a gang argument over someone

15  disrespecting a gang member that had been recently deceased.

16  Apparently, Chee is a street name for a rival gang member.

17  They were talking about TJ's dead brother, and they said that

18  Booman or Mr. Sherrod, started throwing up gang signs, which

19  we assume would be Crip gang signs.  Booman ran up on TJ with

20  his shirt lifted up and started bumping him with his shoulder.

21  Booman, Frog, and J, or Mr. Sherrod, Machita Mitchell, and

22  Jaylyn Griffis, pressured him -- pressured TJ to shoot at

23  Mook, which is Marvel Harris, a rival gang member.

24       During all this, apparently, according to Mr. Jackson, Mr.

25  Sherrod pulls out his Mack and tried to shoot, but it did jam

1  on him and he couldn't get a shot off.

2      At a later time, after this -- sometime during the

3  incident, TJ loses the ten-millimeter pistol, he either drops

4  it, throws it, whatever, in the club.  A bouncer or head of

5  security for the club, who goes -- his name is Kenneth

6  Johnson, he goes by L.A. Moe, he was featured on the HBO

7  documentary, "Bangin' in Little Rock."  He's a known OG Crip.

8  He takes possession of the gun and secures it to keep it from

9  being taken by Little Rock police.

10     TJ gives information that he gave Mr. Sherrod a hundred

11 dollars to get that gun back from Moe.  And then, Mr. Sherrod

12 was going to then turn it back over to Frog.

13 Q   And this information was provided by Mr. Jackson in an

14 interview?

15 A   That is correct.

16 Q   Okay.  All right.  If we could, prior to all of this in

17 July of 2016 [sic], was there some jail calls in July and

18 August of 2016, where Mr. Sherrod was speaking to individuals

19 on jail calls discussing drug trafficking and a trip to South

20 Texas and into Mexico?

21 A   Yes, there is.  The first call was July 25th, 2016, an

22 inmate, who we believe goes by the name Mike, we're not a

23 hundred percent positive on that, tells -- first of all, tells

24 Sherrod that he's got a -- a cousin who goes by Little Ed,

25 that's going to be getting out of jail fairly soon and has 25.

1  We don't know if it's 25 hundred, 25 thousand.  We assume it's

2  a quantity of cash.  He asked Mr. Sherrod to fuck with him and

3  not to screw him over because Little Ed is tryin' to eat.  So

4  we assume that he is requesting that Mr. Sherrod do a --

5  broker a deal with him so that he can sell narcotics so he can

6  make a living.

7  Q   And do the individuals frequently speak in coded language

8  on these types of calls?

9  A   Yes, they do.

10 Q   Okay.  In August of 2016, are there also some calls that

11 indicate Mr. Sherrod made a trip to South Texas and into

12 Mexico?

13 A   Yes, there is.  In one call, there was an unknown

14 individual who made a phone call to Mr. Sherrod's cell phone,

15 and he tells -- Mr. Sherrod tells him he's still out of down

16 [sic] -- he's still out of town.  I'm sorry.  And the inmate

17 asked him, he said, "Well, do you like that view of the border

18 line?"

19     In another call, they're -- they're having a conversation

20 about something that was said to Chris Alexander that got back

21 to the inmate's mother.  He says, "Did you say something to

22 Murda?"  And he goes, "Hell, no."  He says, "I'm in Laredo, by

23 Mexico.  He's still in Little Rock."  Referring to the fact

24 that he did not converse with Chris Alexander.

25 Q   Okay.  And were there, in fact, some photographs

1   indicating Mr. Sherrod did take a trip to South Texas?

2   A   Yes.  We located Facebook photographs of -- of Mr. Sherrod

3   and Mr. Machita Mitchell at the border crossing at Laredo,

4   Texas.

5   Q   And are there subsequent jail calls that have discussions

6   between Mr. Mitchell, even after Mr. Mitchell was locked up,

7   where Mr. Mitchell and Mr. Sherrod are discussing furthering

8   their drug activity with their Mexican source of supply?

9   A   Yes.  In July 14th of 2017, there's a discussion between

10  the two where Mr. Sherrod discusses wanting to get some mac &

11  cheese and Yoda.  Mac & cheese is what we believe -- they use

12  the term mac, mac & cheese, and macaroni, to refer to their

13  Mack 10, Mack 11, but it's a -- basically a -- a firearm.  And

14  Yoda, we believe is going to be narcotics.  We're not a

15  hundred percent sure.  But, like I said, they often use code

16  to cover up what they're trying to discuss.  They briefly

17  discuss Chris Alexander.  And then they talk about getting

18  with Taco.  Taco, we believe, is a Mexican source of supply.

19  And they talk about how Sherrod sent the paper and is going to

20  go talk to him.  We believe "sent the paper" means deliver

21  money, money for product.  And to make sure that they go

22  through so they can pull up on the house.  And they said that

23  he's already told their Mexican source of supply.

24  Q   Okay.  And then, was there a subsequent communication a

25  few days later where Mr. Sherrod indicates that they already

1   hit him up with a frick?

2   A    Yes.   July 17th, there's a conversation in which Sherrod

3   says that he's been communicating with their source of supply.

4   He said they already hit him up with a frick.   A frick, we

5   believe, is a brick of narcotics.   In the world of a Crip, the

6   "B" is a -- they don't like to use the letter "B."   They -- it

7   references Bloods.   They'll often swap a letter out.   So

8   instead of saying brick, they might say frick.   We believe

9   though that it is a brick of narcotics of some sort.

10      He said that they already hit him up with a frick and it

11  looks good.   There is, again, another reference to a macaroni,

12  which we believe, again, is a -- either a Mack 10, Mack 11,

13  some kind of a firearm like that.   And they discuss the source

14  of supply are gonna have to get a house, and that Machita

15  Mitchell will have to write him with some -- tell Mr. Sherrod

16  some numbers and where to go, likely contacts who he normally

17  delivered to, and where to deliver these narcotics.

18      They also talk about how Hot Dog, which is a person they

19  referred to negatively as Chris Alexander, they -- after -- I

20  guess after they went on the outs, they no longer referred to

21  him in a positive light, they start calling him Hot Dog.   They

22  refer to him, they say, "He can't get the change ready."   And

23  they talk about -- he says he talked to George, who hit him up

24  with the shit.   George is, we believe, one of their Mexican

25  sources of supply.   They also discuss driving, making a trip,

1  and making a bitch Lexus drive, make the trip as a last

2  resort.  We believe that means making another trip probably --

3  possibly to either South Texas or Mexico.

4  Q   All right.  And then were there some subsequent

5  conversations between Mr. Sherrod and Mr. Mitchell relating to

6  an issue that Mr. Mitchell and Mr. Sherrod were having with

7  Mr. Alexander?

8  A   Yes.  On July 19th, it was a very vague conversation, very

9  coded conversation.  But based on what we know from numerous

10 street sources and confidential informants, we believe that

11 Chris Alexander somehow ripped off Machita Mitchell, and

12 possibly Mr. Sherrod, of a large amount of either money or

13 marijuana.  We believe marijuana, due to numerous sources.

14 And there is -- the conversation on July 19th, 2017, vaguely

15 talks about the fact that Mr. Alexander stole marijuana from

16 them.

17 Q   Okay.  And then, subsequently, in the -- in the earlier

18 July of 2017 conversation, was there some talk about getting

19 an affidavit together, Mr. Sherrod getting an affidavit?

20 A   Yes.  We believe that he's trying to get an affidavit

21 together to -- to claim possession of a firearm located during

22 the search warrant, so that Machita Mitchell wouldn't be

23 charged with it.

24 Q   Okay.  All right.  And then, July 23rd, 2017, was there

25 some additional discussion with Mr. Sherrod and Mr. Mitchell

1  about their drug trafficking activities?

2  A   Yes.  They start -- they discuss money.  There's a

3  reference to shake and putting orange peels in it, and we

4  believe that's a reference to some bad marijuana or -- or not

5  high quality marijuana.  They talk about the bad weed "isn't

6  gettin' a brother lifted."  We believe not getting them high,

7  it's not good quality.  There's a reference to the Mexican

8  source of supply again, saying, "He hasn't been answering the

9  phone," but they had asked Mr. Sherrod for 15,000 dollars,

10 "but they didn't even have shit," was what he told Mr.

11 Mitchell.

12     Then they go on again to talk about how they should have

13 -- Mr. Sherrod and Mr. Griffis should have taken that charge

14 for him.  We, again, assume referring to the firearm located

15 in the house.

16 Q   All right.  Can you tell us about the conversations --

17 well, what happened on July 24th of 2017, was there a murder

18 in Little Rock of Chris Alexander's child?

19 A   Yes, there was.  July 14th -- or I'm sorry, July 24th,

20 2017, Cyncere Alexander was murdered at an apartment complex

21 off of Green Mountain in Little Rock.

22     Prior to that, there was a phone call placed by Mr.

23 Mitchell to Mr. Sherrod.  During that phone call, Sherrod

24 tells Mitchell, "I told that nigga I needed that motherfuckin'

25 dub."  Dub, we believe, is possibly referring to weed or maybe

1   20.  Dub usually is a reference to maybe something -- anything

2   with the number 20 in it.  So it may be 20 pounds, 20,000, we

3   don't know, or it could be dub, as in "W" for weed.  Again,

4   they're speaking in  code.  He says -- there was some

5   inaudible conversation.  Then he says, "Make sure you go ahead

6   and get this one before I get it."  Sherrod then states, "I

7   really just want to let TJ run up in that motherfucker."

8   Mitchell replies, "Do you know where it is?"  And Sherrod

9   says, "West Little Rock."  Mitchell asks, "That's where it's

10  at?"  And Sherrod responds, "Yeah.  I seen like 20 of them,

11  but he came out the back with them, so I don't know if that's

12  where the rest at or not."  Sherrod later states, "He ain't

13  got nothin' but his bad ass little son up in that

14  motherfucker."  Mitchell asked, "Cyncere?"  And Sherrod

15  replies, "Yeah."  Sherrod then repeats that he wants to "let

16  dude run up in that motherfucker and get that."  Mitchell

17  replies, "Hell yeah.  Snatch that little nigga's ass and tell

18  him, nigga, you better come with it."  Mitchell ends the

19  conversation by telling Sherrod, "Alright. I'm gonna call you

20  in the mornin' to see what all went down."

21      This conversation took place approximately one to two

22  hours after this telephone conversation -- or this -- I'm

23  sorry, the telephone conversation took place approximately one

24  to two hours prior to the homicide.

25  Q   And then there was some discussion previously or testimony

1  about Mr. Sherrod believing that Mr. Alexander had a hit out

2  on him at some point?

3  A   Yes.   There's even telephone conversations where Mr.

4  Sherrod tells Machita Mitchell that Chris has put ten bands on

5  him.   "Ten bands" is a slang term for 10,000 dollars.   And

6  that would refer to a hit put out on him.   And we believe that

7  it's possibly related to the fact that Chris Alexander

8  believes that Sherrod had something to do with his son's

9  murder.

10 Q   All right.   Let's go on to an incident that occurred in

11 2015, November 19th of 2015, that --

12 A   [Coughs.]

13 Q   Sorry.

14 A   Excuse me.   Repeat that.

15 Q   Sorry.

16 A   I'm sorry.

17 Q   November 19th of 2015, a charge that Mr. Sherrod faced

18 relating to a battery incident in Little Rock; can you tell

19 the Court about --

20      MS. GRAY:   Your Honor, we object.   That case was *nol*

21 *prossed* and it's 2015.   All the incidences that we're talking

22 about -- right now, we're talking about presently 2018 and the

23 possibility of Mr. Sherrod being released.

24      MS. MAZZANTI:   Your Honor, Mr. Sherrod was positively

25 identified by two people as a shooter in that incident.

1    THE COURT:  Let me ask you, does it go beyond what's

2  already in the Pretrial Services Report?

3    MS. MAZZANTI:  I don't recall if the --

4    THE COURT:  Because it says -- the Pretrial Services

5  Report says that same thing.

6    MS. MAZZANTI:  Oh, the addendum?

7    THE COURT:  Yes.  I think it probably says what your

8  detective is going to say.

9    MS. MAZZANTI:  The only additional thing is that not

10  only did the victim identify the defendant as one of the

11  individuals who shot, but also the -- Micah Spence, who was

12  with him, also identified the defendant.  That's the only

13  additional fact.

14    THE COURT:  All right.  We'll go ahead and move on.

15

16  BY MS. MAZZANTI:

17  Q   Okay.  Okay.  So that's covered.  On 8/24 of 2017, did Mr.

18  Sherrod have an incident with law enforcement police officers

19  whenever he was out driving without a license?

20  A   Yes.  They came into contact with him.  They've had

21  previous contact with him and they -- they knew that he did

22  not have a driver's license.  When they advised him -- when

23  they pulled him over, and he pulled over, they advised him

24  that they were going to have to impound his vehicle.  He began

25  cursing at them and refusing to follow their orders.  He was

Schmeckenbecher - Direct/Cross                    60

1  -- he subsequently stepped out and told them that there was a

2  firearm in the vehicle.

3  Q   Okay.  And then during the arrest on the witness bribery

4  charge, September 12th, 2017, was there an issue with Mr.

5  Sherrod and their attempts to put him into custody at that

6  time?

7  A   Yes.  According to that officer's report, when they made

8  the stop, he held his hands out the window, but he would not

9  unlock the door when they told him to do so.  They said that

10 he then began to reach down, but not in the direction of the

11 door locks.  He advised them that he did have a firearm with

12 him.  So they began to grab his arms and pull him through the

13 door, and they -- according to that report, he again tried to

14 reach down, but not in the direction of the door locks or door

15 handle.

16         MS. MAZZANTI:  Okay.  That's all I have, Your Honor.

17         THE COURT:  Cross?

18                      CROSS EXAMINATION

19 BY MS. GRAY:

20 Q   I'm going to go back a little bit, you covered a lot of

21 ground.  Let's go over -- essentially, you, yourself, I

22 understand you're with the FBI Gang Task Force, correct?

23 A   Yes, ma'am.

24 Q   Okay.  Now, all of the testimony that you presented, you

25 never witnessed Kenwan Sherron [sic] -- Sherrod sell any

Schmeckenbecher - Cross                               61

1   drugs, did you?

2   A    No, I did not.

3   Q    Okay.  Let's go back to the house at Timber -- is it

4   Timber Valley Road?

5   A    Timberview.

6   Q    Timberview Road.  Okay.  Were you involved in the

7   execution of the search warrant?

8   A    No, I was not.

9   Q    Okay.  Has there been any evidence presented that Kenwan

10  Sherrod's name appears on the deed of that home?

11  A    No, there is not.

12  Q    Any evidence presented that Kenwan Sherrod's name appears

13  on any utility bill?

14  A    No, there is not.

15  Q    Any evidence that Kenwan Sherrod was receiving any mail at

16  that home?

17  A    No, there is not.

18  Q    So, there's been no evidence presented that Kenwan Sherrod

19  himself had any proprietary interest in that home at Timber

20  Valley [sic] Road, correct?

21  A    No.  Correct.

22  Q    Okay.  Now, Machita Mitchell, his name has continued to

23  come up, the home has been determined to belong to Machita

24  Mitchell; is that correct?

25  A    I believe so, yes.

1  Q   And I believe the -- your testimony earlier was that the

2  occupants, when the warrant was served, was Machita Mitchell,

3  his wife, I believe Jaylyn -- what's the last name?

4  A   Jaylyn Griffins [sic].

5  Q   Jaylyn Griffins.

6  A   Or Griffis.

7  Q   Griffis.  Okay.  And maybe some of Machita's children,

8  correct?

9  A   Yes, and as well as Mr. Sherrod.

10 Q   And Mr. Sherrod.  Right.  All the evidence that you have

11 encountered indicates that Kenwan Sherrod was present at that

12 house, correct?

13 A   That's correct.

14 Q   Okay.  The -- no firearm was located on Kenwan Sherrod; is

15 that correct?

16 A   No firearm was found on him, but he claimed possession of

17 some to the officers there.

18 Q   Right.  Of a firearm that was at the house --

19 A   Correct.

20 Q   -- but not on Kenwan Sherrod?

21 A   Correct.

22 Q   And along those lines, Mr. Sherrod is not a convicted

23 felon, correct?

24 A   That's correct.

25 Q   And you have a Constitutional right to carry a firearm?

1   A    That's correct.

2   Q    Mr. Sherrod has the same right; is that correct?

3   A    That is correct.

4   Q    The home itself, I believe there were some statements made

5   with regard to who -- what and who, whatever belonged to

6   whomever.  Machita Mitchell says -- first place, where was the

7   marijuana found in the home?

8   A    There was -- marijuana was found in at least two locations

9   that I'm aware of.  One was -- the largest quantity was found

10  in the garage.

11  Q    Okay.

12  A    And the second quantity was found next to the gun in the

13  top of the closet --

14  Q    Okay.

15  A    -- next to the loaded Smith & Wesson M&P.

16  Q    Did either of those areas, the garage or the closet,

17  require a key to get access to it?

18  A    The garage would have.

19  Q    Okay.  And then I believe Mr. Machita Mitchell says that

20  -- that he's the one with the key to the marijuana in the

21  garage?

22  A    That's correct.

23  Q    Okay.  The closet where the marijuana was found, was it a

24  bedroom closet?

25  A    Yes, I believe it was.

1   Q   Okay.  Do you know which, was it a master bedroom, guest

2   bedroom?

3   A   It wasn't the master, but I do not know as far as who was

4   occupying --

5   Q   Okay.

6   A   -- who -- who lived in that room, as far as that space.  I

7   don't remember.

8   Q   Nothing that had Kenwan Sherrod's name on it was found in

9   either of the areas where the marijuana found; is that

10  correct?

11  A   I'm not sure.  Not to my knowledge, no, but.

12  Q   Okay.  So, what we're talking about this point is that

13  there's an allegation of who those -- those guns belong to,

14  correct?

15  A   That's correct.

16  Q   Okay.  There was a gun found in the couch cushion?

17  A   That is correct.

18  Q   Okay.  And is that -- was it a Smith & Wesson; is that the

19  one that it's alleged that Kenwan Sherrod said belonged to

20  him?

21  A   I believe that's the one from the affidavit that he claims

22  possession of in the affidavit.

23  Q   Right.  Then there was a gun, of course, found in the

24  closet, near the marijuana, correct?

25  A   That's correct.

1  Q   Okay.  Now, has --

2  A   Which -- which happens to be the firearm that he claimed

3  on the jail phone call.

4  Q   Okay.  And along those same lines, Mr. Griffith --

5  A   Griffis.

6  Q   -- Griffis --

7  A   Uh-huh.

8  Q   -- has since made a statement, correct, since that --

9  since the date of that search warrant being served at the

10  Timber Valley [sic] Road?

11  A   I'm not sure if he's a made a statement or not.

12  Q   Has he made any claim that either of those guns are his?

13  A   To the officers at that scene, yes, he -- he claimed

14  firearms, yes.

15  Q   Okay.  And I believe there's testimony that there was

16  records shown, I believe, that one of those guns was sold to

17  Toni [sic] Combs, that --

18  A   There was -- there was a gun case there.

19  Q   Okay.

20  A   But not -- not the firearm itself.

21  Q   Okay.

22  A   But there was a gun -- like several gun cases with serial

23  numbers, those firearms, had they been present, would have

24  returned to a Toni [sic] Combs.

25  Q   Combs.  Okay.  I see.

1  A    But those firearms were not present, just the boxes

2  themselves that the firearms came in from manufacturers.

3  Q    Okay.  And I believe there were ledgers found there at the

4  Machita Mitchell home?

5  A    That is correct.

6  Q    And those ledgers would indicate what?

7  A    They would tend to indicate the transaction, who owes what

8  money.  They usually tend -- that's how they keep track of who

9  owes them.

10  Q    Okay.

11  A    It's almost like their own credit system.

12  Q    Was Kenwan Sherrod's name associated with those ledgers?

13  A    I have not been able to review that ledger.  It is

14  currently in a Little Rock Police evidence locker.

15  Q    So you don't know?

16  A    No, I do not.

17  Q    Okay.  It's my understanding, the result of the search

18  warrant, there were scales, pipes, drug ledgers, magazines for

19  firearms; is that correct?

20  A    That is correct.  Yes.

21  Q    Okay.  There was 23,750 dollars in cash located in a safe?

22  A    Yes, ma'am.

23  Q    Where was that safe located in the house?

24  A    To my knowledge -- I'm trying to remember -- I believe

25  that was found in the bedroom belonging to Mr. Mitchell, but I

1   -- let me refer to my notes on that one.

2   Q   Okay.  Machita Mitchell, again, has said the marijuana was

3   his?

4   A   That's correct.

5   Q   Okay.  And that the -- he had the key to where the

6   marijuana was located?

7   A   That's correct.

8   Q   Okay.  I believe your testimony was with regard to Machita

9   Mitchell saying that he wanted Kenwan Sherrod to destroy

10  Mitchell's phone and the contacts in it?

11  A   That's correct.

12  Q   Do you have any evidence that that actually was carried

13  out?

14  A   We've never recovered a phone, so we don't -- I mean, we

15  wouldn't know.

16  Q   Okay.  And again, that's just from a overheard jail

17  conversation, correct?

18  A   That is correct.

19  Q   Okay.  Then there was some testimony about a August 14th,

20  2017, a hearing was held, where it was -- I guess it was

21  testified to that two guns were Machita Mitchell's and two

22  guns were Mr. Griffis'?

23  A   I believe that two guns were Mr. Sherrod's and two guns

24  were Mr. Griffis'.

25  Q   What hearing was this?

1   A    I believe this was a bond hearing for Mr. Mitchell.

2   Q    Okay.  Whose court would that have been in?

3   A    I want to say it was Chris Piazza, Judge Chris Piazza, but

4   I -- I'm not a hundred percent positive on that, but I -- I

5   believe it's Chris Piazza's court.

6   Q    Were you present?

7   A    No, I was not.

8   Q    Do you know if Kenwan Sherrod testified during that bond

9   hearing?

10  A    We have a transcript of his testimony.

11  Q    So, Kenwan Sherrod did testify?

12  A    Yes, he did.

13  Q    Okay.  There was testimony about a Tyrone Nutt, that two

14  people, Frog and Murda, came to Mr. Nutt's house with guns?

15  A    That's correct.

16  Q    Okay.  Was -- Mr. Sherrod was never charged with that; is

17  that correct?

18  A    No, to my knowledge, he was not present.

19  Q    And where did this information come from?

20  A    I'm sorry?

21  Q    Where did the information come from about two people, Frog

22  and Murda, came to Mr. Nutt's house with guns?

23  A    Mr. -- Mr. Nutt actually filed a police report with Little

24  Rock Police Department.

25  Q    Okay.  I see.  Do you know when that report would have

1   been filed?

2   A    I want to say February of '16.  I don't know the exact

3   date --

4   Q    Okay.

5   A    -- but I believe it was somewhere around February of '16

6   -- of 2016.

7   Q    Okay.  And then we move to -- is it September of 2017 or

8   2016 when there are calls, supposedly, between Machita

9   Mitchell and Mr. Sherrod, where Tyrone Nutt is trying to have

10  the charges dropped?

11  A    That would be 2017.

12  Q    2017.  And again, that's a jail conversation, correct?

13  A    That is correct.

14  Q    So, from your testimony, I think there was efforts made by

15  Mr. Nutt to get the charges dropped?

16  A    That is correct.

17  Q    Okay.

18  A    He went to the prosecutor's office on two separate

19  occasions, on back to back days.  To my -- if I remember

20  correctly, one was September 5th, and then the subsequent day

21  was September 6th.  Those were the two days that he went and

22  tried to get the prosecutor's office to drop those charges.

23  Q    Okay.  I believe there was testimony also about Mr.

24  Sherrod going to Laredo, Texas?

25  A    Yes.

1  Q   Okay.  And that's -- you got that from just jail

2  conversations?

3  A   Jail conversations.  We actually have border crossing -- I

4  don't have them with me today, but we do have records of their

5  border crossings --

6  Q   Okay.

7  A   -- where they crossed the border; it was Mr. Sherrod, a

8  Jorge Perez, and Mr. Machita Mitchell.

9  Q   Okay.  If I understood your testimony, it's the police

10  were told by Mr. Jackson that Mr. Sherrod, Mr. Mitchell, and

11  Jaylyn, went to Power Ultra Lounge, and that Mr. Sherrod --

12  they all three had a gun?

13  A   That is correct.

14  Q   Where did that information come from?

15  A   That came from Mr. Jackson.

16  Q   Was he arrested for anything?

17  A   Yes, he was charged with multiple counts of battery and

18  terroristic act in reference to that Power Ultra Lounge

19  shooting.

20  Q   Okay.  So, he was basically involved in the shooting at

21  Power Ultra Lounge, and implicated Mr. Sherrod; is that

22  correct?

23  A   That is correct.

24  Q   Okay.  How long have you been working -- how long have you

25  been investigating Mr. Sherrod?  Let's start there.

1  A   I'd say probably around September of 2017.  I was

2  initially investigating Mr. Mitchell, Machita Mitchell.  But

3  through the various jail phone calls, it kind of led me

4  towards Mr. Sherrod, as well.

5  Q   Okay.  And, so far, your investigation has -- as the

6  result of your investigation, has it resulted in him being

7  arrested in that witness bribery charge?

8  A   That is correct.

9  Q   Okay.  And when is that set for trial?

10  A   I -- I have no idea.

11  Q   Okay.

12  A   Ms. Field was here earlier, I believe she's the prosecutor

13  on the case, so she would know, but I don't -- I don't know.

14  Q   Mr. Mitchell was actually charged in state court with

15  those drugs and those guns; is that correct?

16  A   That is correct.

17  Q   And Mr. Sherrod was not; is that correct?

18  A   At that time, no, he was not.

19  Q   Okay.  So his -- his charge has only been since -- over

20  here in federal court?

21  A   That is correct.

22  Q   With pretty much the same conduct of Mr. Machita Mitchell?

23  A   That is correct.

24  Q   Okay.

25          MS. GRAY:  Nothing further, Your Honor.

1          THE COURT:  Redirect?

2                        REDIRECT EXAMINATION

3    BY MS. MAZZANTI:

4    Q    Just two things.  Mr. -- or a couple of things.  Mr.

5    Sherrod has indicated that he is a drug user; is that right?

6    A    That's correct.

7    Q    And is it your understanding that the federal law

8    prohibits a drug user from possessing and carrying a firearm?

9    A    That's correct.

10   Q    And with respect to Mr. Sherrod, where he lives, did Mr.

11   Mitchell indicate to law enforcement that Mr. Sherrod was

12   residing with him at that residence at the time law

13   enforcement came on June 13th, 2017?

14   A    Yes, we -- both, Mr. Machita Mitchell, as well as a later

15   interview with his -- with his wife, both revealed that Mr.

16   Sherrod was living with them at the time of that search

17   warrant.

18          MS. MAZZANTI:  That's all I have.

19          THE COURT:  Recross?

20                        RECROSS EXAMINATION

21   BY MS. GRAY:

22   Q    You said Mr. -- you said Mr. Mitchell and his wife

23   revealed that Mr. Sherrod was living with them?

24   A    That is correct.

25   Q    Okay.

1   A   And these were in two separate interviews, several months

2   a part.

3   Q   Okay.  Is Mr. Mitchell -- is he a convicted felon?

4   A   Yes.

5   Q   What about his wife?

6   A   I have no idea.  I have not looked her up.  I don't know.

7   Q   Okay.

8   BY THE COURT:

9   Q   Was it a warrant or was it a search based on him being on

10  parole?

11  A   It was a search based on him being on parole.

12  Q   Okay.

13  A   There was a search waiver on file.

14  Q   That's what I thought.  And what led you to -- what led

15  the authorities to go to that residence?

16  A   I honestly don't know, sir.

17  Q   All right.

18  A   They -- they did get a search warrant after finding

19  certain things, but the original search was just a part of

20  their -- their home visit.

21  Q   I see.  Okay.  Then, when the -- when Mr. Sherrod was down

22  in Texas and made the border crossing, it appears he would

23  have been on bond from the battery case; are you aware of any

24  of that?  I mean, because my next question would be, do you

25  know was he in violation of bond?  I mean, I imagine you can't

1  go to Mexico when you're on state bond, but.

2  A   Yeah, honestly, I -- I don't know when that trial was --

3  or that case was adjudicated to be exact.

4  Q   It says it was *nol prossed* February of 2017.  Charge was

5  November of 2015.  So it would have been square in the middle

6  of that.

7  A   So he would have -- yeah, most likely he would have --

8  yeah, he would have most likely been on bond.

9  Q   But you don't have any information on that?

10  A   I don't have any proof of that, but.

11  Q   Okay.

12  A   I don't know if Ms. Mazzanti does or not.

13  Q   The last area I want to cover, on Mr. Alexander's child,

14  Cyncere --

15  A   Uh-huh.

16  Q   -- Alexander, correct?

17  A   Correct.

18  Q   So, do you have any knowledge of the facts of any of that?

19  I mean, was it a robbery, as well?  It sounded like that it

20  was supposed to be a robbery and --

21  A   To --

22  Q   -- and also.  But go ahead.

23  A   Yeah.  To -- to my knowledge, sir, there is -- there's no

24  proof of a robbery.  The house was not ransacked or anything.

25  To law enforcement knowledge, they don't know of anything

1  missing.  Chris Alexander told law enforcement that he didn't

2  know of anything missing.  So, that's kind of where we stand

3  as far as that investigation.

4  Q   Has anybody been charged in the murder?

5  A   Not to this point, no.

6           THE COURT:  All right.  Questions based on my

7  questions?

8           MS. MAZZANTI:  No, Your Honor.

9           MS. GRAY:  No, Your Honor.

10           THE COURT:  All right.  You may stand down, sir.

11  Thank you.

12           THE WITNESS:  Thank you.

13      (Witness stands down.)

14           THE COURT:  Do you have any other evidence, Ms.

15  Mazzanti?

16           MS. MAZZANTI:  No, Your Honor.

17           THE COURT:  Do you all wish to make argument?

18           MS. GRAY:  Yes, Your Honor.

19           THE COURT:  All right.

20           MS. GRAY:  Your Honor, the standard that the Court

21  has to consider is whether or not Mr. Sherrod is a threat of

22  danger to the community and/or is he a flight risk, and the

23  Court has to determine that there are no conditions that could

24  be put in place to reasonably ensure the safety of the

25  community or his appearance in court.

1    Your Honor, we maintain that with electronic

2  monitoring and his mother as third party custodian any flight

3  risk concerns or threat of danger to the community will be

4  resolved.

5    What the Court has heard today with regard to Mr.

6  Sherrod is all based on hearsay, innuendo, second and third

7  party information from convicted felons and people who have

8  their own interests at stake.

9    THE COURT:  What about -- what about the calls though

10 that you have Mr. Sherrod's voice reporting things directly?

11 I mean, that's -- that's -- that doesn't fall into -- that

12 doesn't paint into the corner you're trying to paint it.  So

13 how do you square that?

14    MS. GRAY:  Well, first off, Your Honor, you're making

15 an assumption, of course, that that is in fact Mr. Sherrod's

16 voice, because we haven't heard anything.  Second of all, Mr.

17 Sherrod was on the -- was not incarcerated.  Okay.  And there

18 is no crime to own or possess a firearm if you're not a

19 convicted felon.

20    THE COURT:  Well, how about he goes down to Mexico,

21 he and Mr. Mitchell, and who is this third person that we

22 don't know who is, why is going down to Laredo and why is he

23 going down to Mexico while he's on bond in this other case?  I

24 mean, that -- that's problematic, I think.

25    MS. GRAY:  I understand, Your Honor, but, once again,

1  the things that the Government wants to present are all lawful

2  activity.  It's not a crime to go to Mexico.  I can go to

3  Mexico.  You can go to Mexico.  I don't know the terms and

4  conditions of Mr. Sherrod's bond.  We don't know if he had

5  permission to go to Mexico or not.  I can own a firearm.  You

6  can own a firearm.  And Mr. Sherrod can own a firearm.

7          THE COURT:  Well --

8          MS. GRAY:  I can affiliate --

9          THE COURT:  -- I can't own a firearm in a drug house

10  that has 40 pounds of dope in the garage and has, you know, a

11  pound of dope in the -- in the closet.  I mean, I can't own a

12  firearm in that circumstance.

13          MS. GRAY:  There, under those exact circumstances, I

14  would --

15          THE COURT:  That's the circumstance that your client

16  was in.

17          MS. GRAY:  -- but, I mean, we're talking legal

18  knowledge.  Because, one, you've got have knowledge; do you

19  know the drugs are there?

20          THE COURT:  Well --

21          MS. GRAY:  If they're locked away in a garage and in

22  a closet, would you know that -- if you're there in the living

23  room, would you know that those drugs are there?  Again,

24  that's a -- that's a -- basically a fight for another day, but

25  the Government still has that burden.

1        The circumstances, as they have been presented, that

2   is not a crime for Mr. Sherrod to have a firearm.

3        Affiliation, I'm not certain -- we all belong to

4   clubs, organizations.  Assuming I'm giving the -- the

5   Government their best case scenario that these -- all these

6   things that they're saying is true, it's not a crime to be a

7   gang member.  No more than it's a crime to belong to a Civics

8   club or a fraternity or a sorority.  Don't laugh.

9        THE COURT:  Well, I appreciate your -- you advocate

10  vigorously for Mr. Sherrod here, but that's a little hard to

11  swallow.  But, I -- I hear what you're saying.

12       MS. GRAY:  The bottom line is, we all have a

13  Constitutional right to the freedom of association.

14       THE COURT:  We do.

15       MS. GRAY:  Whether it's with a convicted felon -- I

16  mean, they -- they have their parameters.  But under the

17  circumstances that Mr. Sherrod has been presented, none of the

18  things that the Government has presented are a crime in and of

19  themselves.

20       Again, we maintain that electronic monitoring.  The

21  people that are of the concern, Chris Alexander and Machita

22  Mitchell, we've learned they're locked up.  So, that's not a

23  concern.

24       If the Court wants to impose any restriction with

25  regard to who Mr. Sherrod can communicate with, who he can

1   associate with, Mr. Sherrod will abide by that.

2        But keeping him locked up, a person who has no felony

3   convictions, who has no criminal history, who has graduated

4   high school, who has a job waiting for him, and is in good

5   standing with his bondsman, that is a person that there are

6   lesser restrictions available with regard to his release than

7   incarceration.

8        So, we'd ask that he be allowed to be released to the

9   custody of his mother, and if the Court deems necessary, with

10  electronic monitoring.

11       THE COURT:  All right.  Thank you, ma'am.

12       MS. MAZZANTI:  Your Honor, I think the Court has

13  heard enough, so I'll try to keep it brief.  But just to -- to

14  rebut some of the arguments by defense counsel, it is, in

15  fact, a crime, if you are a drug user, which Mr. Sherrod is

16  admittedly a drug user and has been since he was 17, it is a

17  crime for him to possess a firearm, and so he was not lawfully

18  in possession of those.  We have the option of superceding and

19  adding that charge.

20       With respect to the other issues, Mr. Sherrod is also

21  claiming a firearm that is right next to a distributable

22  amount of marijuana that is in a closet in a house that Mr.

23  Mitchell and Mr. Mitchell's wife say he lives in.

24       And so, you know, that is very strong evidence of the

25  924(c) charge that we have here.

1    In addition to that, it looks like, in the course of

2  trying to -- to cover, in part, for Mr. Mitchell and get

3  everybody's stories straight, it appears that Mr. Sherrod may

4  have inadvertently or purposely taken responsibility for three

5  of the four guns in the house.  You know, he says that the one

6  on the floor, on the shoes, is his whenever the law

7  enforcement enter.  He subsequently signs an affidavit saying

8  that the .40 cal on the couch, Smith & Wesson, is his.  And

9  then he -- he, on the jail call, claims the firearm that's in

10  the closet.

11    And so, you know, this is a house that has over 80

12  pounds of marijuana in it.  Based on all of the evidence here,

13  he continued in this marijuana conspiracy even after Mr.

14  Mitchell was locked up, so he can't blame all his bad acts on

15  other people.  You know, I understand his mother's position,

16  and that was a little bit of the gist of her testimony, but he

17  is a grown man and he made the choices that he made.

18    He chose to continue to engage in drug trafficking,

19  even after Mr. Mitchell was arrested, based upon the jail

20  calls that were summarized for the Court.  And that's only

21  bolstered by his continued participation and interaction with

22  Mr. Mitchell, Mr. Alexander, and evidence of their gang

23  affiliation is evidence of their opportunity and motive to be

24  in this conspiracy together and -- and shows the relationship

25  between all of them.

1        Then, in addition to just the drug charges and the

2   guns that are at issue here, obviously, drugs and guns

3   together, that's a -- a known issue with the court.  That is

4   dangerous inherently.  And then you have a situation where Mr.

5   Sherrod is participating in trying to tamper with witnesses,

6   and, you know, at a club where people get shot.  And, you

7   know, according to one of the shooters at that club incident,

8   Mr. Sherrod is essentially riling him up in order to -- which

9   results in the shooting incident starting.

10       We have trips to --

11       THE COURT:  But he was never charged in -- he was

12   never charged, and there was a lot of charges that came out of

13   that whole nightclub fracas.  And Mr. Sherrod was never

14   charged in any of that?

15       MS. MAZZANTI:  Mr. Sherrod was never charged.  Mr.

16   Sherrod told TJ that he tried to shoot, but could not.

17       THE COURT:  Let me ask you this, because I think Ms.

18   Gray's best argument is -- and it's a good one -- you know,

19   the Bail Reform Act says I've got to consider no condition or

20   combination of conditions that would ensure the -- and I think

21   the issue here is mainly the safety of the community, moving

22   him to Jacksonville, on electronic monitoring; why is that not

23   -- why does she not win on that?

24       MS. MAZZANTI:  Because, one, as -- as well

25   intentioned as his mother may be, clearly, she has issues -- I

1  mean, she can't control a grown man.  Her son is a grown man.

2        THE COURT:  But what about the electronic monitoring

3  is going to keep him in that residence?

4        MS. MAZZANTI:  If he were on lock down, I would be

5  concerned, frankly, about the safety of the -- the people in

6  the residence.  I mean, this is a -- the situation that we're

7  in, we have people shooting at each other on a regular basis,

8  including known associates of Mr. Sherrod.  And I get her

9  point that Mr. Alexander and Mr. Mitchell are locked up right

10  now, but that doesn't change the fact, and that's part of the

11  reason that we talked about their gang affiliation for a

12  period of time, you know, it's -- obviously, Mr. Mitchell has

13  had the ability to contact -- have contact with the outside

14  world and give directions and discuss and conspire with people

15  in the outside world, because the witness tampering issue, and

16  then the subsequent drug trafficking, occurred while Mr.

17  Mitchell is locked up.  And so, I -- that does not make me

18  feel any better to put him in Jacksonville in a house with a

19  baby.

20        THE COURT:  All right.

21        MS. MAZZANTI:  In addition to that, you know, there's

22  -- there's the whole issue about Mr. Alexander's suspicions

23  surrounding Mr. Sherrod's involvement in his son's murder.

24  That's an additional issue that, you know, Ms. -- that Mr.

25  Sherrod's mother may be putting herself in harm's way over, if

1  -- if there's anything to that, which clearly Mr. Sherrod

2  believed there was, because he was discussing it on the jail

3  calls, and even she was aware of it.

4          And then, last, but certainly not least, we have Mr.

5  Sherrod identified as an individual who shot someone in the

6  middle of the street in Little Rock.

7          And so, all of those things indicate that Mr. Sherrod

8  is a danger to the community.  He does not need to be out.

9  And it is not safe for him to be out, not only for him, but

10 for the people around him, and for the rest of the community.

11         And so, he should be detained.  He also has -- at the

12 very end of the testimony, we talked a little bit about his

13 interactions with law enforcement.  And, frankly, if he got

14 out on bond, I'm not confident he wouldn't -- he would violate

15 and we would have to send the Marshals out after him, and then

16 they would be having to pull him out of a car with a gun in

17 it, and I think that that is a likely scenario considering his

18 past behavior, and it puts them at risk, and I'm not willing

19 to do that.

20         THE COURT:  Let me rewind though.  The battery charge

21 is, you know, very concerning.  I guess I should have asked

22 the state prosecutor who was in here, you know, that case gets

23 *nol prossed*, so why should I now take the burden of trying to

24 take action based on a case that the state decided that they

25 didn't want to pursue?

1    MS. MAZZANTI:  Well, you know, the state has

2  different considerations.  Obviously -- in that case,

3  obviously, there was some sort of -- of issue.  And I'll just

4  proffer to the Court that based upon my review of the file, it

5  appears that there was an issue with respect to the other

6  individuals involved in that; it appears to be a shootout

7  between both sides.  There are -- the -- there are shell

8  casings from a --

9    THE COURT:  That's all right.  You don't have to get

10  into it in great detail.

11    MS. MAZZANTI:  There's a shootout, and essentially

12  there's -- there are witness issues, and -- but regardless of

13  that, somebody's shooting up the middle of the streets in the

14  city of Little Rock and resulting in somebody going to the

15  hospital and being in critical condition, that is a serious

16  offense regardless of whether the state had a self defense

17  issue or whatever issue they may have had.

18    THE COURT:  All right.  Fair enough.

19    I'm going to take a brief recess and consider the

20  Bail Reform Act and I will be back with a decision promptly.

21  Thank you.

22    (Recess.)

23                         AFTER RECESS

24    THE COURT:  Well, kind of reminds me of an analogy

25  when I was a young trial lawyer.  I remember a older lawyer I

1   was telling about a case I had -- and this may be a bad

2   example, but it kind of reminds me of where we are and why I'm

3   making the decision I'm going to make -- and the older lawyer

4   said, "Oh, you got a case against those two lawyers.  Well,

5   you better be careful, because lawyer X will think of it and

6   lawyer Y will do it."  And it was, you know, not in a

7   flattering light; it was that lawyer X will think of ways to

8   do bad deeds, and lawyer Y actually has the guts to actually

9   do it.  And that's what we really have here.

10          And that's why I think you make a very good argument,

11  Ms. Gray, and you make the best argument for Mr. Sherrod, that

12  the Bail Reform Act says I have to find that there's no

13  condition or combination of conditions, and your proposal of

14  electronic monitoring is a good one, but the whole case is Mr.

15  Sherrod is the doer, he's the guy -- the other guys are

16  thinking this stuff up, and they're phoning him, or he's

17  interacting with them, even though they're locked up most of

18  the time -- or one is locked up most of the time, Mr. Sherrod

19  is the one who is able to -- to take the actions.

20          The very, very concerning, the timing of this phone

21  conversation with -- regarding the Cyncere Alexander being

22  killed, I'd be real surprised if Mr. Sherrod isn't in the

23  sights of Little Rock detectives on that.  But, like I say,

24  too much smoke and a lot of fire.  I disagree on the right to

25  have a firearm; I don't think Mr. Sherrod has a right to have

1   a firearm in a drug house.  And, you know, it doesn't take a

2   whole lot to add two and two together here to know what's

3   going on.

4        And also, like I say, I'm -- I'm very convinced

5   what's going on here when you've got Mr. Sherrod going down to

6   Old Mexico with, you know, some unknown individual and his

7   confederates.

8        And as good meaning as Ms. Williams is, she doesn't

9   -- I don't think she even knows half of what's going on with

10  Mr. Sherrod.  I think she's putting on a very good effort

11  here.  And, Mr. Sherrod, you're lucky that your mom is willing

12  to come to bat for you.  And just, you know, like I say, you

13  need to really think about what she's willing to do to help

14  you.  And you're awfully, awfully young.  And you've not been

15  convicted of anything, but you've sure racked up some serious

16  stuff.

17       And then, you know, just to add one last piece of

18  information here on this.  The bribery, I think is pretty

19  strong evidence, like I say, that, you know, people will think

20  it up and Mr. Sherrod will do it.  That's very concerning to

21  me.  And it goes to the core of our society.  And the -- the

22  way we can all live in peace and harmony is to rely on the --

23  the justice system to resolve things, but when you've got

24  people that are willing to attack that, that, to me, really

25  cuts to the core of who we are in this country and how we keep

1  things orderly.

2          And so, I think it's a pretty easy call, Mr. Sherrod,

3  that you are, by clear and convincing evidence, a danger to

4  the community.  And even the very thoughtful proposal that Ms.

5  Gray has made still doesn't allow me to find that you are not

6  going to be a danger -- dangerousness -- or you're not going

7  to be a danger to the community, and that condition just

8  doesn't resolve my fear.

9          THE DEFENDANT:  [Indiscernible].

10         THE COURT:  You're welcome talk if you'd like.

11         MS. GRAY:  No.

12         THE DEFENDANT:  Can I say something?

13         MS. GRAY:  No.  Okay.  Against the advice of counsel,

14  you --

15         THE COURT:  You have very able counsel there, Mr.

16  Sherrod.  I'd -- I'd advise you to listen to her.  She's done

17  an able job.  I know, you know, the outcome wasn't in your

18  favor, but it's not her fault; it's the facts.

19         MS. GRAY:  I'm just advising you not to do it.

20      (Ms. Gray confers with the Defendant, off the record.)

21         MS. GRAY:  There is nothing that you can say that's

22  going to change his mind, I can tell you that right now.  You

23  have the right to say what you want to say, but I'm telling

24  you to shut up.

25         THE COURT:  Ms. Gray, do we need to hear from Mr.

1  Sherrod?

2          THE DEFENDANT:  Sir --

3          MS. MAZZANTI:  Your Honor, before Mr. Sherrod speaks,

4  I would just like the Court to caution him that he -- although

5  he's in custody, if he makes any statements, they can be used

6  against him in a later proceeding.

7          THE COURT:  Well, you're voluntarily giving up these,

8  whatever you want to say, Mr. Sherrod, so it's up to you, but.

9          MS. GRAY:  She's saying she's going to use whatever

10  you say against you.  And I'm advising you to be quiet.

11     (Ms. Gray confers with the Defendant, off the record.)

12          MS. GRAY:  It doesn't matter what you tell him.

13  Look, you've been advised.  Do what you want to do.  The judge

14  wants to know if you want to say something though.

15          THE DEFENDANT:  [No audible response.]

16          THE COURT:  All right.  Probably a good choice there,

17  Mr. Sherrod.

18          Is there anything else we need to take up in this

19  case, Ms. Gray?

20          MS. GRAY:  No, Your Honor.

21          THE COURT:  From the prosecution?

22          MS. MAZZANTI:  No, Your Honor.

23          THE COURT:  I commend both sides, you guys put on an

24  excellent case.

25          Marshals, thank you for getting Mr. Sherrod here on

1   time, on target.

2          We'll be adjourned.

3      (Adjournment at 1:04 p.m.)

4           ELECTRONIC SOUND RECORDING CERTIFICATION:

5   I, court approved transcriber, certify that the foregoing is a

6   correct transcript from the official electronic sound

7   recording of the proceedings in the above-entitled matter.

8

9   /s/Robin Warbritton                March 20, 2018
    Signature of Approved Transcriber    Date

10

11  Robin Warbritton
    Typed or Printed Name

12

13

14

15

16

17

18

19

20

21

22

23

24

25